GREEN BAY & MISSISSIPPI CANAL COMPANY
*v.* PATTEN PAPER COMPANY.

ERROR TO THE SUPREME COURT OF THE STATE OF WISCONSIN.

No. 14. Argued January 13, 14, 1898. — Decided November 28, 1898.

No particular form of words or phrases in which a claim of Federal rights must be asserted in a state court has ever been declared necessary by this court; but it is sufficient, if it appears from the record that such rights were specially set up or claimed there in such way as to bring the subject to the attention of the state court.

Under the legislation and contracts set forth in the opinion of the court in this case, the water power incidentally created by the erection and maintenance of the dam and canal for the purpose of navigation in Fox River is subject to control and appropriation by the United States, and the plaintiff in error is possessed of whatever rights to the use of this incidental water power could be granted by the United States.

At what points in the dams and canal the water for power may be withdrawn, and the quantity which can be treated as surplus with due regard to navigation, must be determined by the authority which owns and controls that navigation.

THIS was a suit brought, in 1886, in the circuit court of Outagamie County, Wisconsin, by the Patten Paper Company and others, against the Kaukauna Water Company, the Green Bay and Mississippi Canal Company and others. The object

of the proceeding, as set forth in the complaint, was to have determined what share or proportion of the flow of Fox River where the same passes Islands Nos. 3 and 4 in township No. 21, north of range No. 18 east, is appurtenant and of right should be permitted to flow in the south, middle and north channels of said river respectively; and to have the defendants restrained from drawing from said Fox River above the head of Island No. 4, and so that there shall not come into the middle channel of said river and into the mill pond of the plaintiffs more water flow of said river than the one-sixth part thereof, or more than the amount which by nature was appurtenant to and flowed in the south channel of said river.

The scope of the investigation was widened by reason of the answer of the Green Bay and Mississippi Canal Company, which it was agreed and stipulated should have the effect of a cross-bill in the action, and which asserted that any decree to be entered in the suit determining or adjudicating what share or proportion of the flow of the river should be, permitted to flow in its several channels, should be made subject to the right of the Canal Company, by reason of the facts stated, to use all of the water power created by the government dam and improvements on the river.

The principal facts disclosed in the case were the following:

The Fox River is a navigable stream, and flows through township 21, north of range 18 east, in the county of Outagamie, Wisconsin, and in said river, below Lake Winnebago, there are and always have been rapids and abrupt falls. To permit navigation through or by said rapids and falls necessarily requires the building of dams, locks and canals at great expense. By an act approved August 8, 1846, 9 Stat. 83, c. 170, Congress granted to the State of Wisconsin, on its admission into the Union, a large amount of public lands for the express purpose of, and in trust for, improving the navigation of the Fox and Wisconsin Rivers. The State accepted said grant of land for said purposes, and by an act of its legislature, approved August 8, 1848, undertook the improvement of said rivers, and enacted, among other things, that "*whenever a water power shall be created by reason of any dam erected*

*or other improvements made on any of said rivers, such water power shall belong to the State, subject to the future action of the legislature."*

One of the rapids in Fox River, around which it was necessary to secure slack water navigation by means of dams, locks and canals, was commonly known as the Kaukauna Rapids. The State adopted a plan and system for the construction of a dam and canal at said Kaukauna Rapids, whereby there was to be built a low dam beginning on the south side near the head of the rapids, extending down stream, on or near the south bank of the river, across lots 8, 7, 6, and on to lot 5 of section 22, and thence extending at about a right angle with the south bank across the river, leaving an opening at the north end through which the water of the river could pass, and be conducted by a conduit or canal to a certain point at which should be placed a lock.

The sales of lands granted by Congress not proving sufficient to carry on the work, the board of public works was authorized by the legislature to issue certificates of indebtedness, which were declared to be a charge upon the proceeds of the lands granted by Congress and upon the revenues to be derived from the works of improvement.

In July, 1853, the state legislature created a corporation under the name of "The Fox and Wisconsin Improvement Company," to which, by the second section thereof, were granted and transferred the uncompleted works of improvement, together with all and singular the rights of way, dams, locks, canals, water power and other appurtenances of said works. The company agreed to pay the outstanding certificates, and forthwith undertook the work. Additional lands were granted by Congress in 1854 and 1855, to aid the State in the improvement of the Fox and Wisconsin Rivers. The company subsequently executed a deed of conveyance of the works of improvement, the incidental water powers and all of the lands, in trust to apply all revenues derived from the improvement and the proceeds of sales of the lands to the payment of the unpaid certificates and of bonds issued by the company, and to the completion of the works.

In 1864 the company failed, the deed of trust was fore-
closed, and, in 1866, the property of the company, consisting
of the works of improvement, the water powers and the lands,
were sold pursuant to a decree of court entered February 4,
1864. The purchasers became incorporated under the name of
the Green Bay and Mississippi Canal Company, and that com-
pany was authorized, by the third section of an act of the legis-
lature approved April 12, 1866, to "enlarge and increase the
capacity of said works and of the said rivers so as to make a
uniform steamship navigation from the Mississippi River to
Green Bay, or to surrender the same to the United States
for such enlargement, on such terms as may be approved by
the Governor for the time being of the State."

July 7, 1870, Congress passed an act entitled "An act for
the improvement of water communication between the Missis-
sippi River and Lake Michigan by the Wisconsin and Fox
Rivers." 16 Stat. 189, c. 210. By this act Congress au-
thorized the Secretary of War to ascertain the sum "which
in justice ought to be paid to the Green Bay and Mississippi
Canal Company as an equivalent for the transfer of all and
singular its property and rights of property in and to the line
of water communication between the Wisconsin River and the
mouth of Fox River, including its locks, dams, canals and
franchises, or so much of the same as shall, in the judgment
of said Secretary, be needed," and to that end he was author-
ized to "join with said company in appointing a board of dis-
interested and impartial arbitrators" — one to be selected by
the Secretary, one by the company, and the third by the two
arbitrators so selected. The act provided that in making their
award the arbitrators should take into consideration the amount
of money realized from the sale of lands granted by Congress
to aid in the construction of said water communication, which
amount should be deducted from the actual value thereof as
found by the arbitrators. It was further enacted that no
money should be expended on the improvement of the Fox
and Wisconsin Rivers until the Green Bay and Mississippi
Canal Company should make and file with the Secretary of
War an agreement, in writing, whereby it shall agree to grant

and convey to the United States its property and franchises upon the terms awarded by the arbitrators.

By an act, approved March 23, 1871, by the legislature of Wisconsin, the directors of the Green Bay and Mississippi Canal Company were authorized to sell and dispose of the rights and property of said company to the United States, and to cause to be made and executed all papers and writings necessary thereto as contemplated in the act of Congress.

Subsequently, in November, 1871, the arbitrators fixed the then value of all the property of the company at $1,048,070, and the amount realized from land sales, to be deducted therefrom, at $723,070, leaving a balance of $321,000 to be paid to the company. And, in anticipation that the Secretary might decide that the personal property and "the water powers created by the dams and by the use of the surplus waters not required for purposes of navigation," were not needed, these water powers and the water lots necessary to the enjoyment of the same, subject to all uses for navigation, were valued at the sum of $140,000, personal property $40,000, and the improvements $145,000.

The Secretary of War recommended to Congress that it should take the works of improvement and not the water powers and personal property. Congress accordingly, by act approved June 10, 1872, made the necessary appropriation, and the company, by its deed of September, 1872, conveyed and granted to the United States " all and singular its property and rights of property in and to the line of water communication between the Wisconsin River and the mouth of Fox River, including its locks, dams, canals and franchises, saving and excepting therefrom, and reserving to the said company, the following described property, rights and portion of franchises which, in the opinion of the Secretary of War and of Congress, are not needed for public use, to wit: First. All of the personal property of the said company, and particularly of all such property described in the list or schedule attached to the report of said arbitrators, and now on file in the office of the Secretary of War, to which reference is hereto made, whether or not such property be appurtenant to

said line of water communication. Second. Also all that part of the franchise of said company, viz., the water powers created by the dams and by the use of the surplus waters not required for the purpose of navigation, with the rights of protection and preservation appurtenant thereto, and the lots, pieces or parcels of land necessary to the enjoyment of the same, and those acquired with reference to the same, all subject to the right to use the water for all purposes of navigation, as the same is reserved in leases heretofore made by said company, a blank form of which attached to the said report of said arbitrators is now on file in the office of the Secretary of War, and to which reference is here made, and subject also to all leases, grants and assignments made by said company, the said leases, et cet., being also reserved therefrom."

The leases referred to, and reserved from the grant, were those granted by the company to third parties, in consideration of the payment of annual rents. The use of the surplus water began as early as 1861, and has extended until now from one quarter to one half of the flow of the river is utilized at points near the first lock. The company has caused to be erected, at this point, large and costly mills, and it was found by the trial court that the Green Bay and Mississippi Canal Company has leased all of the water power created by the dam and canal, or arm of the dam, to be used over the water lots abutting on the canal.

The cause having been submitted to the Superior Court of Milwaukee County, upon the pleadings and proofs, that court sustained the allegations contained in the cross-complaint of the Green Bay and Mississippi Canal Company, and adjudged, among other things, that "The Green Bay and Mississippi Canal Company is the owner of and entitled as against all the parties to this action, and their successors, heirs and assigns, to the full flow of the river, not necessary to navigation, and that all and singular the other parties to this action are hereby forever enjoined from interfering with the said Green Bay and Mississippi Canal Company in so withdrawing and using such water ; and it is further considered and adjudged and decreed as in favor of the Patten Paper Company against all other

defendants, that all of the water of the river which is permitted by the Green Bay and Mississippi Canal Company to flow over the upper dam or into the river above Island No. 4, so as to pass down the river, should be, and it is hereby, divided and apportioned between the plaintiffs and their successors and assigns, the Kaukauna Water Power Company, and its successors and assigns, and the Green Bay and Mississippi Canal Company, and its successors and assigns, between and to the south, middle and north channels of the river in the following proportions, et cet."

The Supreme Court of Wisconsin reversed the judgment so rendered by the Superior Court, and remanded the case to the Superior Court with directions to enter judgment in accordance with its opinion. That court, in obedience to the mandate of the Supreme Court, entered a final judgment in the case, as follows, omitting recitals :

" Upon motion of Hooper and Hooper, plaintiffs' attorneys, it is considered, adjudged and decreed, as in favor of the Patten Paper Company, Union Pulp Company and Fox River Pulp and Paper Company against all defendants, that all the water of the river except that required for purposes of navigation shall be and is hereby divided and apportioned between and to the south, middle and north channels of the river, in the following proportions, that is to say : 43–200 thereof of right should flow down the south channel; 157–200 thereof should of right flow down the main channel of the river, north of Island No. 4, and that of the water so of right flowing down the main channel of the river, north of Island No. 4, and above the middle channel, 62–157 thereof should of right flow down the middle channel and south of Island No. 3, and that of the water flowing down the north channel north of Island No. 4, and above Island No. 3, 95–157 part should of right flow down the north channel and north of Island No. 3; and each of the parties to this action, their heirs, successors and assigns, are forever enjoined from interfering with the waters of said river so as to prevent their flowing into said channels in the proportions aforesaid.

" And it is further adjudged by the court that said Green

Bay and Mississippi Canal Company, its successors and assigns, shall so use the water, if at all, created by said dam, as that all the water used for water power or hydraulic purposes shall be returned to the stream in such a manner and at such a place as not to deprive the appellants or those claiming under or through them of its use as it had been accustomed to flow past the lands of the said appellants on said river and in the several channels of said river below said dam as it was accustomed to flow, and that said appellants shall have the right to use the water of said river, except such as is or may be necessary for navigation, as it was wont to run in a state of nature without material alteration or diminution."

From this judgment the Green Bay and Mississippi Canal Company, plaintiff in the cross-bill, appealed to the Supreme Court of the State; and on January 10, 1896, the respondents, the present defendants in error, moved to dismiss said appeal for the reason that the judgment was in exact accord with the mandate and was in effect the judgment of the Supreme Court. Upon this motion the Supreme Court dismissed the appeal, expressing itself as follows:

"After careful consideration we are constrained to hold that the judgment entered is a substantial compliance with the mandate of this court. Certainly it would have been improper to allow any amendment to pleadings or new litigation. The mandate was not for a new trial, nor for further proceedings according to law, but with direction to enter judgment in accordance with the opinion, and the opinion left nothing undetermined. This left nothing for the trial court to do in the case except to enter judgment therein as directed."

By that appeal and its decision the jurisdiction of the state courts in the case was exhausted, and the judgment entered in the Superior Court became the final judgment of the highest court in the State in which a decision in the suit could be had. And on May 18, 1896, a writ of error to said judgment by the Green Bay and Mississippi Canal Company was taken to this court and allowed by the Chief Justice of the Supreme Court of Wisconsin.

*Mr. B. J. Stevens* and *Mr. William F. Vilas* for plaintiff in error. *Mr. E. Mariner* was on their brief.

*Mr. Alfred L. Cary, Mr. George G. Greene* and *Mr. Moses Hooper* for defendants in error. *Mr. John T. Fish* and *Mr. David S. Ordway* were on their brief.

Mr. Justice Shiras, after stating the case, delivered the opinion of the court.

First for our consideration is the motion made by the defendants in error to dismiss the writ of error because the record does not disclose that any Federal question was involved in the controversy, and because no title, right, privilege or immunity claimed under the Constitution of the United States, or any treaty or statute of, or commission held or authority exercised under the United States, was specifically set up or claimed in the trial court or in the Supreme Court of the State of Wisconsin by the plaintiff in error, nor was there any decision in either of said state courts against any such title, right, privilege or immunity specially set up or claimed by the plaintiff in error.

The contention that no Federal question is disclosed in the record is sufficiently disposed of, we think, by an inspection of the cross-complaint filed by the Green Bay and Mississippi Canal Company. It was therein claimed that the water power in question was created by a dam, canal and other improvements owned and operated by the United States, and that the right and title of the said Canal Company to the use of the water power so created arose under and by virtue of certain alleged and recited acts of Congress and acts of the legislature of the State of Wisconsin, relating to the improvement of Fox River as a public highway, and especially by virtue of an alleged contract between the United States and the Canal Company, whereby the use of the surplus water created by said dam and canal was granted and reserved to the Canal Company.

Assuming the truth of such allegations, it is plain that the

plaintiff in error asserted a right and title and authority exercised under the United States.

It is, however, urged that, whatever may have been the right, title, privilege or authority possessed by the Canal Company and derived from the United States, such right, title, privilege or authority was not specially set up and claimed in the state courts at a time and in a manner to give this court jurisdiction.

This contention is based on the words in section 709 of the Revised Statutes, carried forward from the twenty-fifth section of the Judiciary Act of 1789, "specially set up or claimed;" and the effect to be given to those words has been frequently considered by this court.

There is a class of cases wherein it has been held and laid down as settled doctrine that "the revisory power of this court does not extend to rights denied by the final judgment of the highest court of a State, unless the party claiming such rights plainly and distinctly indicated, before the state court disposed of the case, that they were claimed under the Constitution, treaties or statutes of the United States; that if a party intends to invoke for the protection of his rights the Constitution of the United States, or some treaty, statute, commission or authority of the United States, he must so declare; and unless he does so declare 'specially,' that is, unmistakably, this court is without authority to re-examine the final judgment of the state court; that this statutory requirement is not met if such declaration is so general in its character that the purpose of the party to assert a Federal right is left to mere inference."

The last elaborate discussion of this phase of the subject is found in the opinion of the court in *Oxley Stave Company* v. *Butler County,* 166 U. S. 648, delivered by Mr. Justice Harlan, in which many of the cases are reviewed and from which the preceding quotation is taken.

But no particular form of words or phrases has ever been declared necessary in which the claim of Federal rights must be asserted. It is sufficient if it appears from the record that such rights were specially set up or claimed in the state

court in such manner as to bring it to the attention of that court.

"The true and rational rule," this court said in *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116, 143, "is that the court must be able to see clearly, from the whole record, that a certain provision of the Constitution or act of Congress was relied on by the party who brings the writ of error, and that the right thus claimed by him was denied." In *Roby* v. *Colehour*, 146 U. S. 153, 159, it was said that "our jurisdiction being invoked, upon the ground that a right or immunity, specially set up and claimed under the Constitution or authority of the United States, has been denied by the judgment sought to be reviewed, it must appear from the record of the case either that the right, so set up and claimed, was expressly denied, or that such was the necessary effect in law of the judgment." "If it appear from the record, by clear and necessary intendment, that the Federal question must have been directly involved, so that the state court could not have given judgment without deciding it, that will be sufficient." *Powell* v. *Brunswick County*, 150 U. S. 433, 440; *Sayward* v. *Denny*, 158 U. S. 180; *Chicago, Burlington &c. Railroad* v. *Chicago*, 166 U. S. 226.

As then in its cross-complaint, the Canal Company explicitly set up and claimed, as the foundation of its alleged rights, the acts of Congress and the transactions between the United States and the Canal Company, under which the United States became the owner of the dam, canal and other improvements on the Fox River, and the Canal Company became vested with its rights in the surplus water power incidental to said works, and as, in the final judgment, the Supreme Court of Wisconsin necessarily held adversely to these claims of Federal right, we hold that the motion to dismiss for want of jurisdiction must be overruled, and that it is our duty to inspect the record in order to see whether there was error in the rulings of the court below.

Whether the water power, incidentally created by the erection and maintenance of the dam and canal for the purpose of navigation in Fox River, is subject to control and appro-

priation by the United States, owning and operating those public works, or by the State of Wisconsin, within whose limits Fox River lies, is the decisive question in this case.

Upon the undisputed facts contained in the record we think it clear that the Canal Company is possessed of whatever rights to the use of this incidental water power that could be validly granted by the United States.

That Fox River is one of the navigable waters of the United States has been already decided by this court in the case of *The Montello*, 20 Wall. 430, upon the same facts, historical and legislative, that are now before us. That was the case of a libel filed by the Government in the Circuit Court of the United States for the District of Wisconsin against the steamer Montello, in admiralty, for non-compliance with acts of Congress making enrolment and license and certain provisions as to steam valves necessary for vessels like the Montello navigating the navigable waters of the United States. The court below dismissed the libel, resting its decision on the ground that before the navigation of the river was artificially improved there had been numerous obstructions to a continuous navigation, by reason of falls and rapids, and that, therefore, Fox River was not a navigable water of the United States. But this court reversed the judgment and held that Fox River is a stream of a national character, and that steamboats navigating its waters are subject to governmental regulations.

To aid in the improvement of the Fox and Wisconsin Rivers, and to connect the same by a canal, the United States, by the act of August 8, 1846, c. 170, 9 Stat. 83, granted a quantity of land on each side of Fox River, and the lakes through which it passes, from its mouth to the point where the portage canal should enter the same, and provided that, as soon as the Territory of Wisconsin should be admitted as a State, all the lands granted by the act should become the property of said State "for the purpose contemplated by the act, and no other." It further enacted that the legislature should agree to accept said grant upon the terms specified in the act, and should have power to fix the price at which said lands should be sold, not less than one dollar and twenty-five cents

the acre; and to adopt such kind and plan of improvement on said route as the said legislature shall from time to time determine for the best interest of said State; and provided, also, that the lands granted should not be conveyed or disposed of by said State, except as said improvements should progress — that is, the said State might sell so much of said lands as should produce the sum of twenty thousand dollars, and then the sales should cease until the Governor of the State should certify the fact to the President of the United States that one half of said sum had been expended upon said improvement, when the said State might sell and dispose of a quantity of said lands sufficient to reimburse the amount expended; and that thus the sales should progress as the proceeds thereof should be expended, and the fact of such expenditure certified in the manner in the act mentioned. It further enacted that the said improvements should be commenced within three years after the said State should be admitted into the Union, and completed within twenty years, or the United States should be entitled to receive the amount for which any of said lands might have been sold by the State.

In February, 1848, the State of Wisconsin was created by the adoption of a constitution, and the legislature of the new State, by an act passed August 8, 1848, accepted the grant from Congress made by the act of August 8, 1846, and organized a board of public works, and authorized the board, in the construction of such improvements, to " enter on, to take possession of and use all lands, waters and materials the appropriation of which for the use of such works of improvement should in their judgment be necessary." The act of August, 1848, contained the following section :

" SEC. 16. When any lands, waters or materials appropriated by the board to the use of said improvements shall belong to the State, such lands, waters or materials, and so much of the adjoining land as may be valuable for hydraulic or commercial purposes, shall be absolutely reserved to the State, and whenever a water power shall be created by reason of any dam erected or other improvements made on any of

said rivers, such water power shall belong to the State subject to future action of the legislature."

Sections 17, 18, 19, 20, 21 and 22 provided for condemnation by the board of such lands, waters and materials belonging to individuals, with whom the board could not agree, and for payment of damages out of the fund.

By an act approved February 9, 1850, c. 283, p. 226, the legislature of Wisconsin enacted as follows:

" The board of public works are hereby authorized and empowered in any future lettings of contracts for the improvement of the Fox and Wisconsin Rivers to consider bids made by any person or persons for improvements which will create a water power, and when such person or persons offer to perform, or perform and maintain, the work in consideration of the granting by the State to him or them, his or their assigns, forever, the whole or a part of such water power: *Provided*, That before such bid is accepted and the contracts entered into it shall receive the approval of the governor.

" When lettings have been made for the improvement of said rivers, whereby a water power is created, the board of public works may relinquish to the person or persons who have performed the same all or a part of such power as a consideration in full or in part for such performance or maintenance of such improvement, or for both."

The eighth article of the constitution of Wisconsin contained the following:

" Sec. 10. The State shall never contract any debt for works of internal improvement or be a party carrying on such works; but whenever grants of land or other property shall have been made to the State, especially dedicated by the grant to particular works of internal improvement, the State may carry on such particular works, and shall devote thereto the avails of such grants, and may pledge or appropriate the revenues derived from such works in aid of their completion."

By the act approved July 6, 1853, the legislature of Wisconsin created a corporation to supersede the board of public works in the construction and maintenance of the improvements on the Fox and Wisconsin Rivers under the name of

the " Fox and Wisconsin Improvement Company," and granted and surrendered to the said company " the works of improvement contemplated by the act entitled ' An act to provide for the improvement of the Fox and Wisconsin Rivers and connecting the same by a canal,' approved August 8, 1848, and by several acts supplemental thereto and amendatory thereof, and known as the ' Fox and Wisconsin Rivers improvement,' together with all and singular the rights of way, dams, locks, canals, water power and other appurtenances of said works; also all the right possessed by the State of demanding and receiving tolls and rents for the same, so far as the State possesses or is authorized to grant the same, and all privileges of constructing said works and repairing the same, and all other rights and privileges belonging to the improvement to the same extent and in the same manner that the State now holds or may exercise such rights by virtue of the acts above referred to in this section."

The Fox and Wisconsin Improvement Company, thus created and empowered, agreed to fully execute the trust, and forthwith undertook the work.

By an act, approved October 3, 1856, c. 112, p. 123, entitled " An act to secure the enlargement and immediate completion of the improvement of the navigation of the Fox and Wisconsin Rivers," etc., it was enacted, by its second section, as follows:

" SEC. 2. To enable said company to make all the dams, locks, canals, feeders and other structures, and to do all the dredging and other work, and furnish all materials necessary to complete the improvement of the navigation of the Fox and Wisconsin Rivers and the canal connecting the same, all the lands now unsold, granted by Congress in aid of said improvement, as explained by the same body, (which grants are hereby accepted,) are hereby granted to the Fox and Wisconsin Improvement Company, subject, however, to the terms and conditions of said grants by Congress, and to the further terms and conditions following, that is to say: That within ninety days after the passage of this act, the said company shall make a deed of trust to three trustees, to be ap-

pointed as hereinafter provided, including and conveying to said trustees and their successors all the unsold lands granted to the State of Wisconsin by the several acts and resolutions of Congress to aid in the improvement of the Fox and Wisconsin Rivers, and all the works of improvements constructed or to be constructed on said rivers, and all and singular the rights of way, dams, locks, canals, water powers and other appurtenances of said works, and all rights, privileges and franchises belonging to said improvement, and all property of said company, of whatever name and description."

By the third section it was enacted that, for raising funds, from time to time, for the construction, enlargement and completion of said works of improvement, and for the purchase of materials to be used therein, etc., said company might issue its bonds, to be countersigned by said trustees, in sums of not less than five hundred nor more than one thousand dollars each, at rates of interest not exceeding ten per centum per annum, payable semiannually, the principal of said bonds payable at a period to be therein named, not exceeding twenty years from their date, etc., and that the payment of said bonds should be secured by the deed of trust aforesaid of said lands, works, water powers, property and franchises.  It was further provided that, in case the company should fail to comply with any of the requirements of the act, or to pay the principal or interest of its bonds, to be issued as therein provided, the said trustees should sell the said lands in tracts not exceeding six hundred and forty acres, and should apply the proceeds thereof to the purposes expressed in the act, and that, if the proceeds of said sales should be insufficient to pay all the evidences of state indebtedness and interest thereon and redeem all the bonds and other obligations of said company, then the said trustees should sell the water powers created by said improvements, and thereafter all the corporate rights, privileges, franchises and property of said company in said improvement, and all appurtenances thereto, to pay the same; and that the purchasers thereof should take, hold and use the same as fully as they were held, used and enjoyed by said company, etc.

By the fourth section it was enacted that the trustees might on the requisition of said company, proceed to sell the lands granted by Congress in aid of said improvement, and might sell or lease the water powers created by said improvement, in such manner and upon such terms, as to price and time and place of payment, as the company might direct ; but that no sales of said lands, or sales or leases of said water powers, should be made until after the execution and delivery of said deed of trust, etc.

In 1864 the company failed, the deed of trust was foreclosed, and the property of the company, consisting of the works of improvement, lands and water powers, were sold, in February, 1866, to purchasers, who became incorporated, under authority of law, as the Green Bay and Mississippi Canal Company. In the act of April 12, 1866, authorizing the purchasers at said sale to form " a corporation for the purpose of holding, selling, operating or managing the lands, water powers, works of improvement, franchises and other property purchased at said sale, or any part thereof," it was enacted that said corporation should have power to enlarge and increase the capacity of said works and of the said rivers so as to make a uniform steamship navigation from the Mississippi River to Green Bay, or to surrender the same to the United States for such enlargement on such terms as should be approved by the Governor of the State.

The amount realized at the sale was just sufficient to pay the state indebtedness, outstanding on account of certificates issued to aid in the work of improvement, and the sum estimated, by a commission duly appointed, to be necessary to complete the improvement.

The Green Bay and Mississippi Canal Company, thus organized, continued to hold the works of improvements and manage the same until, in 1870, Congress passed an act providing for the purchase from the company of " all and singular its property and rights of property in and to the line of water communication between the Wisconsin River and the mouth of the Fox River, including its locks, dams, canals and franchises, or so much of the same as should, in the judgment of the Secre-

tary of War, be needed," and authorizing the appointment of a board of arbitrators, to be mutually chosen, who should appraise the properties to be taken.  This act provided that in making their award the arbitrators should take into consideration the amount of money realized from the sale of the lands granted to the State of Wisconsin to aid in the construction of said water communication, which amount was to be deducted from the actual value thereof as found by the arbitrators.

In pursuance of this legislation, the arbitrators were appointed and acted.  They fixed the value of the company's property at $1,048,070; the amount of the land sales at $723,070; leaving a balance of $325,000 to be paid the company.  They valued the water power and the water lots necessary to the enjoyment of the same at the sum of $140,000; the personal property at $40,000, and the improvement at $145,000.

Subsequently Congress, by act of June 10, 1872, c. 416, 17 Stat. 370, appropriated the amount of $145,000, and on September 18, 1872, the Canal Company, by its deed of that date, transferred and conveyed the works of improvement to the United States, reserving to itself the personal property and the water powers in the language following:

" All that part of the franchises of said company, viz.: The water powers created by the dams and by the use of the surplus waters not required for purposes of navigation, with the rights of protection and reservation appurtenant thereto, and the lots, pieces or parcels of land necessary to the enjoyment of the same, and those acquired with reference to the same, all subject to the right to use the water for all purposes of navigation, as the same is reserved in leases heretofore made by said company; . . . and subject, also, to all leases, grants and assignments made by said company, the said leases, etc., being also reserved herefrom."

Since that time the United States have assumed possession and exclusive control of the rivers, and have expended several millions of dollars in their improvement, in pursuance of yearly appropriations; and the Canal Company has con-

tinued, until the decree complained of in the present case, in the possession and enjoyment of the water powers and water lots mentioned in the report of the arbitrators and reserved in the deed to the United States.

It is apparent from the conceded facts that the water power in question did not exist while the stream was in its natural condition. Nor was it created by the erection of a dam by private persons for that sole purpose.

We, of course, must accept the doctrine of the Supreme Court of Wisconsin, that it would not be competent even for the legislature to legalize such structures for private purposes. Such a question is for the state tribunals.

But we have here the case of a water power incidental to the construction and maintenance of a public work and, from the nature of the case, subject to the control of the public authorities, in this instance the United States.

It also appears that, through the entire history of this improvement, these incidental water powers were recognized by the legislature of the State as a source of revenue for the promotion and success of the public enterprise, and in aid of its completion. By the act of July 6, 1853, the water powers were granted with the rest of the public works to the Fox and Wisconsin Improvement Company, upon a public trust to continue and complete the partially constructed highway, and the company was thereby authorized to mortgage such water powers, as part of the plant, to secure bonds issued to raise money for that purpose; and, subsequently, upon a foreclosure the entire property became vested in the Green Bay and Mississippi Canal Company.

The case of *Kaukauna Co.* v. *Green Bay and Mississippi Canal Co.*, 142 U. S. 254, involved some of the questions presented in the present case. There a private riparian owner sought to withdraw water from this very dam to furnish power to its works. The Canal Company filed a bill against such owner, the Kaukauna Water Company, to enjoin it from interfering with the Canal Company in building and maintaining the dam, and from cutting said dam in order to permit a flow of water out of the pool into the works of the defendant.

The decree asked for was granted by the Circuit Court of Outagamie County, and that judgment was affirmed by the Supreme Court of Wisconsin. 70 Wisconsin, 645. The case was brought to this court where it was contended, on behalf of the Kaukauna Water Power Company, that said company, by reason of ownership of the bank and of the bed of the stream, was the owner of the use, while passing, of all the water which might flow over the bed of the stream; in other words, was the owner of all the water power which could be utilized upon its land; and that, therefore, the act of the State of Wisconsin of August 8, 1848, was void as an impairment of such property rights. The judgment of the court below was affirmed in an opinion by Mr. Justice Brown, some of the observations of which are so pertinent to our present purpose that we quote them at some length:

"The case of the plaintiff canal company depends primarily upon the legality of the legislative act of 1848, whereby the State assumed to reserve to itself any water power which should be created by the erection of the dam across the river at this point. No question is made of the power of the State to construct or authorize the construction of this improvement, and to devote to it the proceeds of the land grant of the United States. The improvement of the navigation of a river is a public purpose, and the sequestration or appropriation of land or other property, therefore, for such purpose is doubtless a proper exercise of the authority of the State under its power of eminent domain. Upon the other hand it is probably true that it is beyond the competency of the State to appropriate to itself the property of individuals for the sole purpose of creating a water power to be leased for manufacturing purposes. This would be a case of taking the property of one man for the benefit of another, which is not a constitutional exercise of the right of eminent domain. But if, in the erection of a public dam for a recognized public purpose, there is necessarily produced a surplus of water, which may properly be used for manufacturing purposes, there is no sound reason why the State may not retain to itself the power of controlling or disposing of such water as an incident of its right to

make such improvement. Indeed, it might become very necessary to retain the disposition of it in its own hands, in order to preserve at all times a sufficient supply for the purposes of navigation. If the riparian owners were allowed to tap the pond at different places, and draw off the water for their own use, serious consequences might arise, not only in connection with the public demand for the purposes of navigation, but between the riparian owners themselves as to the proper proportion each was entitled to withdraw — controversies which could only be avoided by the State reserving to itself the immediate supervision of the entire supply. As there is no need of the surplus running to waste, there was nothing objectionable in permitting the State to let out the use of it to private parties, and thus reimburse itself for the expenses of the improvement.

"The value of this water power created by the dam was much greater than that of the river in its unimproved state in the hands of the riparian proprietors, who had not the means to make it available. Those proprietors lost nothing that was useful to them, except the technical right to have the water flow as it had been accustomed and the possibility of their being able some time to improve it. If the State could condemn this use of the water, with the other property of the riparian owner, it might raise a revenue from it sufficient to complete the work, which might otherwise fail. There was every reason why a water power thus created should belong to the public rather than to the riparian owners. Indeed, it seems to have been the practice, not only in New York, but in Ohio, in Wisconsin and perhaps in other States, in authorizing the erection of dams for the purpose of navigation, or rather public improvement, to reserve the surplus of water thereby created to be leased to private parties under authority of the State; and where the surplus thus created was a mere incident to securing an adequate amount of water for the public improvement, such legislation, it is believed, has been uniformly sustained."

The learned judge then proceeds to cite decisions to that effect rendered in several of the state Supreme Courts.

As respected the right of the riparian owners in that case to recover compensation for their property thus taken, this court held that the act of Congress of March 3, 1875, c. 166, 18 Stat. 506, to aid in the improvement of the Fox and Wisconsin Rivers, made a proper provision for such compensation, and that although the act of 1875 may have been repealed by the act of February 1, 1888, c. 4, 25 Stat. 4, 21, yet that the lapse of thirteen years had afforded a reasonable opportunity for the Kaukauna Water Power Company to have obtained compensation for the damages sustained by the construction of the improvements.

As previously stated, the State of Wisconsin, by its act of October 3, 1856, granted and conveyed to the Fox and Wisconsin Improvement Company all the rights and interest of the State in the improvement, including the water powers created thereby, and, in case the sales of the granted lands should fail to realize a sum sufficient to complete the intended works of improvement and to pay the outstanding indebtedness of the State, and redeem the bonds issued by the company, the State authorized the sale of the water powers created by the said improvements. And, subsequently, by act of March 23, 1871, the State authorized the Green Bay and Mississippi Canal Company, which had become the owner of the entire improvement works, lands and water powers by purchase at the foreclosure sale, to sell and dispose of the same to the United States.

The legal effect and import of the sale and conveyance by the Canal Company were to vest absolute ownership in the improvement and appurtenances in the United States, which proprietary rights thereby became added to the jurisdiction and control that the United States possessed over the Fox River as a navigable water. By the findings of the arbitrators the sum of three hundred and twenty-five thousand dollars was payable to the Canal Company, but, by agreement and under the act of Congress of June 10, 1872, the United States consented to the retention by the Canal Company of certain personal property and of the water powers, with the lots appurtenant thereto, in part payment of the sum at which

the entire plant had been appraised; and accordingly, in its deed of conveyance, the company reserved to itself such personal property and the water powers and appurtenances, and the United States paid the remaining sum of one hundred and forty-five thousand dollars.

The substantial meaning of the transaction was, that the United States granted to the Canal Company the right to continue in the possession and enjoyment of the water powers and the lots appurtenant thereto, subject to the rights and control of the United States as owning and operating the public works, and that the United States were credited with the appraised value of the water powers and appurtenances and the articles of personal property. The method by which this arrangement was effected, namely, by a reservation in the deed, was an apt one, and quite as efficacious as if the entire property had been conveyed to the United States by one deed, and the reserved properties had been reconveyed to the Canal Company by another.

So far, therefore, as the water powers and appurtenant lots are regarded as property, it is plain that the title of the Canal Company thereto cannot be controverted; and we think it is equally plain that the mode and extent of the use and enjoyment of such property by the Canal Company fall within the sole control of the United States. At what points in the dam and canal the water for power may be withdrawn, and the quantity which can be treated as surplus with due regard to navigation, must be determined by the authority which owns and controls that navigation. In such matters there can be no divided empire.

This aspect of the subject was before us in *Wisconsin* v. *Duluth,* 96 U. S. 379, 387, where the State of Wisconsin sought, by an original bill in this court, to restrain the city of Duluth from changing the current of the St. Louis River and making other improvements in the city harbor to the detriment, as was claimed, of the harbor of Superior City within the jurisdiction of Wisconsin. It, however, was disclosed that Congress had made large appropriations for the work complained of, and that the executive department had taken

exclusive charge and control of it.   The court dismissed the bill, and in its opinion, by Mr. Justice Miller, said :

"Nor can there be any doubt that such action is within the constitutional power of Congress.   It is a power which has been exercised ever since the Government was organized.   The only question ever raised has been how far and under what circumstances the exercise of the power is exclusive of its exercise by the States.   And while this court has maintained, in many cases, the right of the States to authorize structures in and over the navigable waters of the States, which may either impede or improve their navigation, in the absence of any action of the General Government in the same matter, the doctrine has been laid down with unvarying uniformity that when Congress has, by any expression of its will, occupied the field, that action was conclusive of any right to the contrary asserted under state authority."

To the same effect is *South Carolina* v. *Georgia*, 93 U. S. 4.

Several cases are cited in the briefs for the defendants in error, wherein it has been decided by state Supreme Courts of high authority that whatever remains of the stream, beyond what is wanted for the public improvement, and which continues to flow over the dam and down the original channel of the river, belongs to riparian owners upon the stream, in the same manner as if the state dam had not been erected.

Our examination of the cases so cited has not enabled us to perceive that they are applicable to the present subject.   In none of them have we found that, by the state legislation, was there a fund created out of the use of the surplus water, to be expended in the completion and maintenance of the public improvement.   As we have seen, the entire legislation, state and Federal, in the present instance, has had in view the dedication of the water powers incidentally created by the dams and canal to raising a fund to aid in the erection, completion and maintenance of the public works; and, as we have further seen, provision was made in the Federal act of 1875 for the ascertainment and payment of damages, in respect to which this court said, in *Kaukauna Co.* v. *Green Bay and Mississippi Canal Co.*, 142 U. S. 254, 279, that "the terms of

this act are broad enough to cover not only lands taken for flowage purposes, but all injury done to lands or other property by means of any part of the works of said improvement, which would include damages caused by the diversion of the waters."

Moreover, in the state cases cited by the defendants in error, the question of Federal jurisdiction and control did not arise and was not considered.

Other propositions, based on the alleged departure by the Supreme Court of the State from the case made by the pleadings, were discussed by the counsel for the plaintiff in error; but, as the views heretofore stated dispose of the case, it is not necessary for us to consider them.

Our conclusion, then, is, that, as by the judgment of the Supreme Court of Wisconsin there was drawn into question the validity of an authority exercised under the United States, to wit, the granting of the said water powers and easement, and the decision was against the validity of such authority, thereby depriving the plaintiff in error of property without due process of law, the judgment of that court must be and is hereby

*Reversed and the case remanded to the Supreme Court of Wisconsin for further proceedings not inconsistent with this opinion.*