MEMPHIS POWER & LIGHT CO. *v.* CITY OF MEMPHIS *et al.*

(*Nashville*, December Term, 1936.)

Opinion filed May 27, 1937.*

*Designated for publication Feb. 4, 1938.

348

350

ARMSTRONG, McCADDEN, ALLEN, BRADEN & GOODMAN, of Memphis, for appellant.

WILLIAM GERBER, ABE D. WALDAUER, and CANALE, GLANKLER, LOCH & LITTLE, all of Memphis, for appellees.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

The bill seeks to enjoin the defendants from proceeding with a contract already entered into with the Tennessee Valley Authority (hereinafter referred to as TVA) and a contract about to be entered into with the Federal Public Works Administration (hereinafter called PWA), upon the ground that such contracts violate certain provisions of the State and Federal Constitutions. The cause was heard by both chancellors in Memphis, who sustained a demurrer to the bill and dismissed it.

In *Tennessee Public Service Co.* v. *City of Knoxville*, 170 Tenn., 40, 91 S. W. (2d), 566, 568, 569, it was said:

"Can this court consider the questions made in the bill in respect of the claimed invalidity of the Act of Congress creating TVA (16 U. S. C. A., sections 831-831cc), or the Act of Congress, title 2 NIRA (40 U. S. C. A., section 401 *et seq.)*, under which PWA is claiming to function? And can this court determine whether the administrator has authority under title 2 NIRA to make the supposed loan and grant to the city of Knoxville?

"Our answer to those questions must be in the negative. TVA is a corporation, chartered by Act of Congress. Neither the corporation, nor any representative, nor agent thereof, is party to this suit. In respect of title 2 NIRA, no agent, representative, nor officer of the government of the United States is party to the suit. In the absence of such party or parties, we think this court is without jurisdiction as to these matters."

Upon request, we have given this matter further consideration, but adhere to our former holding.

■ Complainant holds a nonexclusive franchise granted by the city of Memphis for the distribution of electric current in that city.

The defendants are the city of Memphis, its mayor and board of commissioners (its governing body), and the Memphis Light & Water Division of said city and its commissioners.

The question of a $9,000,000 bond issue for the construction or acquisition of a municipal plant for the distribution of TVA power was submitted to the voters of Memphis at an election held on November 6, 1934, and by the overwhelming vote of 32,735 to 1868 the electorate favored the bond issue.

By chapter 616 of the Private Acts of 1935 the Memphis Light and Water Division, and its governing board of commissioners, were created. Section 3 of said act provides as follows:

"Said Board of Light and Water Commissioners shall have the power and authority to purchase electric current from the Tennessee Valley Authority or from any other person, firm or corporation as in the judgment of said Board of Light and Water Commissioners shall be proper or expedient, and to make any and all contracts necessary and incident to carry out this purpose," etc.

And by section 7 it is further provided:

"That the Light and Water Commissioners shall have the right to make any and all contracts necessary or convenient for the full exercise of the powers herein granted, including, but not limited to, (a) contracts with any person, federal agency, or municipality for the purchase or sale of energy, and (b) contracts with any person, federal agency, or municipality for the acquisition of all or any part of any system or systems; and in connection with any such contract, notwithstanding any provision of this or any other Act, the Light and Water Commissioners shall have power to stipulate and agree to such covenants, terms and conditions as the Board may deem appropriate, including, but without limitation, covenants, terms and conditions with respect to the resale rates, financial and accounting methods, services, operation and maintenance practices, and the manner of disposing of the revenues of the system or systems conducted and operated by the Commission," etc.

By virtue of the authority thus conferred upon it, the city, on November 23, 1935, entered into a written contract with TVA for the purchase of electric power for a period of twenty years at a stipulated rate, the reasonableness of which is not questioned. The right of TVA to dispose of its electric energy is fully sustained by the following decisions of the Supreme Court of the United States: *Ashwander* v. *Tennessee Valley Authority,* 297 U. S., 288, 56 S. Ct., 466, 472, 80 L. Ed., 688; *Arizona* v. *California,* 283 U. S., 423, 51 S. Ct., 522, 75 L. Ed., 1154; *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S., 53, 33 S. Ct., 667, 57 L. Ed., 1063; *Utah Power & Light Co.* v. *Pfost,* 286 U. S., 165, 52 S. Ct., 548, 76 L. Ed., 1038; *Green Bay & M. Canal Co.* v. *Patten Paper Co.,* 172 U. S., 58, 19 S. Ct., 97, 43 L. Ed., 364.

The power to purchase such electric energy is clearly authorized by the provisions of the legislative act quoted above.

The primary insistence of complainant is that the contract of the city with TVA confers governmental powers upon the latter by delegating to it authority to fix resale rates in violation of article 2, section 3, of the State Constitution, which is as follows:

"The Legislative authority of this State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives, both dependent on the people, who shall hold their offices for two years from the day of the general election."

It will be observed that the foregoing section says nothing about rate making as to utilities, is not specific nor self-executing, but is necessarily subject to judicial construction. *Home Building & Loan Ass'n* v. *Blaisdell,* 290 U. S., 398, 54 S. Ct., 231, 78 L. Ed., 413, 88 A. L. R., 1481.

The provisions of the contract which complainant assails are as follows:

"6. *Resale Rates*: In order to facilitate the disposition of surplus power generated by Authority and not needed by it in its operations, and in order to carry out the intention of Congress to encourage the more abundant use of electricity throughout the area in which Board operates, Board agrees to charge consumers the rates set forth for the several classes thereof in Schedule B-1 to B-5A, inclusive, of the said Schedule of Rates and Charges and not to depart therefrom except by agreement of Board and Authority. Additional resale schedule for special classes of consumers or special uses of electricity may be added from time to time by agree-

ment of Board and Authority. If it should appear that the rates provided for in said resale schedule with the surcharge provided for therein do not produce revenue sufficient to operate and maintain Board's electric system on a self-supporting and financially sound basis, as provided by chapter 616 of the Private Acts of Tennessee for 1935, then Board shall, by agreement with Authority, prescribe and enforce such changes in rates as will provide for the increased revenues necessary to place the system upon such a self-supporting and financially sound basis.

"7. *Disposition of Board's Revenues*: Board deeming it necessary for the purposes of this contract, and for the purpose of providing reasonable rates for electric service pursuant to this contract and to the law, agrees to dispose of its gross revenues from electric operations in the following manner:

"(a) Revenues shall first be used for the payment of all current operating expenses, including, without limitation, salaries, wages, cost of materials and supplies, power at wholesale and insurance.

"(b) From remaining revenues Board shall next currently provide for the payment at maturity of interest accrued on all bonds or other indebtedness applicable to Board's electric system, and for amortization charges on all such bonds or other indebtedness and/or sinking fund payments thereon.

"(c) Thereafter revenues shall be used currently to set up reasonable reserves for replacements, new construction and for contingencies, and to provide a reasonable amount of cash working capital.

"(d) From remaining revenues Board shall thereafter pay into the General Fund of Municipality a re-

turn on its investment and a tax equivalent as provided in the Financial and Accounting Policy in the Schedule of Terms and Conditions of Contract attached hereto.

"(e) All remaining revenues shall be considered surplus revenues and may be devoted by Board to the purchase or retirement of bonds or other indebtedness before maturity, and if not so devoted shall serve as the basis for the reduction or elimination of surcharges to consumers, and thereafter for the reduction of rates.

"Surplus revenues shall be computed as of December 31, and June 30, of each year."

■ As to the dual capacity of a municipality, we quote from 43 C. J., 179-182, as follows:

"While in a general sense the functions of municipal corporations are all of a public nature, it is well recognized and generally established that a municipal corporation acts in, or possesses, a dual capacity, or double character, or dual character, a twofold character, exercising correspondingly twofold functions, two classes of powers, two classes of rights, and two kinds of duties. In one of these dual capacities, considered as an agency of the state, the corporation exercises functions and powers, possesses rights, and has imposed upon it duties variously designated as public, legislative, political, or governmental, and acting in this capacity a municipality acts as a sovereignty. In the other of these dual capacities, not considered as an agency of the state, the municipal corporation exercises functions and powers, possesses rights, and has imposed upon it duties variously designated as private, *quasi*-private, proprietary, business, commercial, ministerial, or merely municipal; and acting in this capacity the municipality acts as a private or *quasi*-private corporation, enjoying powers and

privileges conferred for its own benefit. While the courts are confronted with difficulty in drawing the line of distinction between governmental functions and powers and private or proprietary functions, the two are clearly separate and distinct, and the functions of the corporation in its legislative or governmental capacity should not be confused with its functions in its proprietary capacity. The fact that the legislature has blended the public and private functions of a municipal corporation in one grant of power does not destroy the clear and well settled distinction between them.''

Complainant predicates its attack upon the false premise that a municipality, in constructing and operating an electric lighting plant, is engaging in a governmental function, whereas the almost universal rule is that in so doing it acts in a private or business capacity.

In 19 R. C. L., 1132, 1133, it is said:

''A municipal corporation, in maintaining a plant for the manufacture or distribution of artificial light, whether gas or electricity, which it transmits to its inhabitants for domestic use, for compensation, acts in its private and not in its governmental capacity, and is liable for injuries resulting from the defective condition of its works, or the negligence of its employees, to the same extent as a private corporation, and the same rules as to the degree of care required to avoid liability apply.''

In 44 C. J., 177, the text, as to the nature of this power, is as follows:

''Whatever a city does in engaging in the furnishing and delivering of electricity to itself and its inhabitants is done in its proprietary or *quasi*-private capacity.''

The exact question was involved in *Saulman* v. *City Council of Nashville*, 131 Tenn., 427, 175 S. W., 532,

534, L. R. A., 1915E, 316, Ann. Cas., 1916C, 1254, in which the court quoted approvingly from MR. McQUILLIN, in his work on Municipal Corporations, as follows:

"It is settled beyond dispute that a municipality which operates its own water, electric light, or gas plant acts in a private and not a governmental capacity, and is liable for its negligence in connection therewith."

In *City of Lawrenceburg* v. *Dyer*, 11 Tenn. App., 493, 502, petition for *certiorari* denied by this court, it was said:

"In the operation of its power plant and lighting system, the city was performing a private, and not a governmental function, and, under the rule of *respondeat superior*, it was liable for negligence of its officers or employees in the maintenance of its lighting system. *Saulman* v. *City of Nashville*, 131 Tenn., 427, 175 S. W., 532, L. R. A., 1915E, 316, Ann. Cas., 1916C, 1254."

In that case a substantial recovery was had for a wrongful death upon the theory that the city was not performing a governmental function in operating its electric plant.

In *Travelers' Ins. Co.* v. *Wadsworth*, 109 Ohio St., 440, 142 N. E., 900, 902, 33 A. L. R., 711, 715, it was stated:

"When a municipality is engaged in operating a municipal plant, under an authority granted by the general law, it acts in a business capacity, and stands upon the same footing as a private individual or business corporation similarly situated." Citing many authorities.

In *Logansport* v. *Public Serv. Commission*, 202 Ind., 523, 177 N. E., 249, 252, 76 A. L. R., 838, 842, the opinion recites:

"A city in the operation of an electric light utility, selling service to the public, acts in its private business capacity and not in its public governmental capacity, regardless of whether its power to so act is inherent, implied, or is granted by statute."

In *Milligan* v. *Miles City*, 51 Mont., 374, 153 P., 276, 278, L. R. A., 1916C, 395, it is said:

"When a city is engaged in operating a municipal plant under an authority granted by the general law, it acts in a proprietary or business capacity. In this behalf it stands up on the same footing as a private individual or a business corporation similarly situated."

In *Springfield Gas & E. Co.* v. *Springfield*, 292 Ill., 236, 126 N. E., 739, 18 A. L. R., 940, the entire court agreed that in operating an electric light plant and selling electricity to individuals the city is not exercising its governmental powers, but its private or proprietary rights, and its duties and liabilities are the same as those imposed by law upon individuals engaged in the same business. The court divided four to three, however, as to the power of a public service commission to regulate the rates to be charged for utility service by a municipally owned or operated utility, the majority holding that it possessed no such power. The case was taken to the Supreme Court of the United States and was affirmed in 257 U. S., 66, 42 S. Ct., 24, 25, 66 L. Ed., 131, the distinction between a private corporation and a municipal corporation, operating a public utility, being thus stated in the opinion:

"The private corporation whatever its public duties is organized for private ends and may be presumed to intend to make whatever profit the business will allow. The municipal corporation is allowed to go into the busi-

ness only on the theory that thereby the public welfare will be subserved. So far as gain is an object it is a gain to a public body and must be used for public ends. Those who manage the work cannot lawfully make private profit their aim, as the plaintiff's directors not only may but must.''

It is unnecessary for us to decide as to the jurisdiction of the Railroad and Public Utilities Commission, a question as to which the authorities are in great conflict, as will be noted in the annotation in 76 A. L. R., 851-855, for the reason that the Legislature, by chapter 42, Pub. Acts 1935, has expressly exempted municipal corporations from the jurisdiction of the Railroad and Public Utilities Commission in this state.

The texts and cases hereinabove referred to cite innumerable authorities supporting our conclusion that the city of Memphis, in constructing and operating an electric plant, functions as a private or business corporation. The cases cited by complainant, such as *Lewis* v. *Nashville Gas & Heating Co.,* 162 Tenn., 268, 40 S. W. (2d), 409, and *City of Memphis* v. *Enloe,* 141 Tenn., 618, 214 S. W., 71, are not in point, since they involved privately owned public utilities, the regulation of which is strictly a governmental function. The authorities which we have cited make clear this distinction.

But as to all public utilities, whether owned by private interests or municipal corporations, the power to fix rates rests primarily with the state, but may be delegated to the municipality. 43 C. J., 421-424. In the instant cause such power was delegated to the city, and it has exercised the authority so conferred upon it and has not, in our opinion, delegated the making of resale rates to TVA. We are unwilling to give the constitu-

tional provision involved such a narrow construction as would result in the destruction of this contract which has the approval of the state, the municipality, and the patrons and taxpayers affected thereby. The legislative act confers upon the city the power to contract with TVA "without limitation," and upon such "covenants, terms and conditions with respect to the resale rates, financial and accounting methods, services, operation and maintenance practices, and the manner of disposing of the revenues," etc., as it deems appropriate. The TVA is a public instrumentality and holds the electric energy generated at its dams in trust for the people of the whole country. *United States* v. *Beebe,* 127 U. S., 338, 8 S. Ct., 1083, 32 L. Ed., 121; *United States* v. *Trinidad Coal Co.,* 137 U. S., 160, 161, 11 S. Ct., 57, 34 L. Ed., 640; *Camfield* v. *United States,* 167 U. S., 518, 17 S. Ct., 864, 42 L. Ed., 260; *Causey* v. *United States,* 240 U. S., 399, 36 S. Ct., 365, 60 L. Ed., 711.

██ ██ One of the objects of TVA is to supply the inhabitants within its territory with cheap electric current. It does not operate for profit. The contract which it has entered into with the city is predicated upon reasonable rates, and there can be little doubt but that in order to effectuate the purpose to protect the public against unjust charges, it reserved the right to approve any increase in rates. There is no provision in the contract authorizing TVA either to increase or reduce the rates agreed upon. The reserved right to approve any increase in charges is a merely supervisory privilege that must be exercised reasonably and not arbitrarily, and, being a servant of the general public, it is presumed that in exercising this right it will conform to the spirit of the contract. *Lummus Cotton Gin Co.* v. *Arnold,* 151

Tenn., 540, 269 S. W., 706; *Dunlap* v. *Sawvel,* 142 Tenn., 696, 223 S. W., 142. But the regulation of rates, however accomplished, is subject to the continuing police power of the state. *Lewis* v. *Nashville Gas & Heating Co., supra.*

■ Assume, for argument, that the city had fixed the rates stipulated in the contract, as it was authorized to do, which were satisfactory to TVA, and that the contract had thereupon been entered into without any provision as to changing rates during the contract period. That would be a valid contract, and would afford no basis for a contention that the city had delegated its rate-making authority to TVA. If such a contract is valid, then it could not be rendered invalid by adding a clause authorizing an increase of rates, with the approval of TVA, if changed conditions should warrant it. That would be but an added privilege for the protection of the city which it did not otherwise possess.

■ As to the other provisions of the contract relative to an accounting system and the disposition of revenue received for current, we find no constitutional infraction. Those stipulations are both reasonable and commendable, and were expressly authorized by the Legislature. Such a large institution functioning for the benefit of the public should keep and maintain an adequate bookkeeping system. Without such a system it would be impossible for TVA, or other interested parties, to ascertain the condition of the plant, whether it was being properly managed, and whether the rates exacted were reasonable and just.

The most salutary feature in the contract is that with respect to the disposition of revenue received. It not only makes the plant self-sustaining and provides for

liquidating its indebtedness, but it prevents the city from diverting the revenue received for current to other purposes.

 The proposed contract with PWA, by which the city is to obtain a long-time loan at a low rate of interest, is attacked upon substantially the same grounds as those interposed to the contract between the city and TVA. The authority for this contract is found in chapter 108, section 2, Private Acts of 1935, Extra Session, and is as follows:

"To make contracts and execute instruments containing such terms, provisions and conditions as in the discretion of the governing body of the municipality may be necessary, proper or advisable for the purpose of obtaining a grant, loan or other financial assistance from any Federal Agency pursuant to or by virtue of the Recovery Act" (defined in section 1 to include NIRA and the Emergency Relief Appropriation Act of 1935); "and to carry out and perform the terms and conditions of all such contracts or instruments."

The provisions of the proposed PWA contract, which complainant insists would make the act invalid, are as follows:

"(1) That no convict labor shall be employed on the project.

"(2) Except in executive, administrative and supervisory positions, so far as practicable and feasible, no individual shall be permitted to work more than eight hours in one day, or more than thirty hours in any one week.

"(3) That the city shall predetermine minimum wage rates in accordance with customary local rates for all trades and occupations employed on the project and

incorporate them in the appropriate contract documents, which shall be compensation sufficient to provide for the hours of labor as limited and a standard of living in decency and comfort.

"(4) In the employment of labor in connection with the project, preference shall be given, first, to ex-service men with dependents, next, to citizens of the United States and aliens who have declared intention to become citizens, residents of the place where the work is located; next, to citizens of the United States and aliens who have declared intention to become citizens, residents of the state, territory and district where the work is located, provided such labor is available and qualified for the work.

"(5) That the maximum human labor should be used in lieu of machinery where practicable and consistent with sound economy and public advantage.

"(6) Employees shall have the right of collective bargaining."

We are of the opinion that under the authority of the Legislature, which we have set out above, the city had a right to make this contract, and, functioning as a private corporation, the question of delegation of power is not pertinent. But in no event can we see wherein the city has delegated any of its powers to PWA, even though they be treated as legislative. It is a matter of public knowledge that this is one of the agencies of the United States created for the purpose of relieving unemployment, and the provisions here complained of were designed with that end in view; and so far as we can discern they are both reasonable and beneficial for all parties concerned. By conforming to these requirements the city obtains the funds with which to construct its

plant on better terms than it could procure them elsewhere, makes a contribution to the relief of unemployment, and aids the Nation in its effort to recover from the economic depression that has caused so much mental and physical suffering. The following excerpt from the opinion in *Hoke* v. *United States,* 227 U. S., 308, 33 S. Ct., 281, 284, 57 L. Ed., 523, 527, 43 L. R. A. (N. S.), 906, Ann. Cas., 1913E, 905, is pertinent:

"Our dual form of government has its perplexities, state and nation having different spheres of jurisdiction, as we have said; but it must be kept in mind that we are one people; and the powers reserved to the states and those conferred on the nation are adapted to be exercised, whether independently or concurrently, to promote the general welfare, material and moral."

The Legislature conferred upon the city a very wide discretion in agreeing to such terms and conditions as it deemed advisable in order to obtain a loan from PWA with which to construct its plant. Pursuant to such authority the city can contract with respect to wages, hours of labor, etc., without violating any of the laws of this state. Such conditions, being agreed upon in advance, become fixed, and are not subject to the whim and caprice of PWA. This is not a case where the lender reserves the right to control wages, hours of labor, etc., as the work progresses. The power of the state and the municipalities to enter into such contracts seems to be well sustained by the authorities. *Heim* v. *McCall,* 239 U. S., 175, 36 S. Ct., 78, 60 L. Ed., 206, Ann. Cas., 1917B, 287; *Ellis* v. *United States,* 206 U. S., 246, 27 S. Ct., 600, 51 L. Ed., 1047, 11 Ann. Cas., 589; *Atkin* v. *Kansas,* 191 U. S., 207, 24 S. Ct., 124, 48 L. Ed., 148, affirming 64 Kan., 174, 67 P., 519, 97 Am. St. Rep., 343;

*People* v. *Crane,* 214 N. Y., 154, 108 N. E., 427, L. R. A., 1916D, 550, Ann. Cas., 1915B, 1254, affirmed in 239 U. S., 195, 36 S. Ct., 85, 60 L. Ed., 218; *Doyle* v. *People,* 207 Ill., 75, 69 N. E., 639; *Hamilton* v. *People,* 194 Ill., 133, 62 N. E., 533; *Woods* v. *Woburn,* 220 Mass., 416, 107 N. E., 985, Ann Cas., 1917A, 492; *Wagner* v. *Milwaukee,* 180 Wis., 640, 192 N. W., 994; McQuillin on Municipal Corporations (2 Ed.), sections 1080, 1302, 2057.

 It is insisted that the contracts in question create a monopoly, violative of article 1, section 22, of the State Constitution. This is incorrect. In the first place, the exclusive right to distribute electricity is not conferred upon the city. The franchise of complainant does not expire until 1952, and no attempt has been made to interfere with its right to dispose of its electric current within the Memphis territory. In the second place, an exclusive franchise to furnish water or light in a particular city does not constitute a monopoly. *City of Memphis* v. *Memphis Water Company,* 52 Tenn. (5 Heisk.), 495.

 The contention that these contracts conflict with article 11, section 8, of the State Constitution, prohibiting class legislation, is without merit. It was so held in *City of Memphis* v. *Memphis Water Company, supra.* And in *Tennessee Public Service Co.* v. *City of Knoxville, supra,* it was said:

"For complainant TPS it is claimed this provision of the charter is obnoxious to the Constitution of the state, in that it is special legislation, and confers upon the city of Knoxville, in its proprietary capacity, rights not conferred upon other cities of the state.

"There is no constitutional inhibition against special legislation as to municipal corporations. *Ballentine* v.

*Pulaski,* 83 Tenn. (15 Lea), 633; *State* v. *Wilson,* 80 Tenn. (12 Lea), 246, 247.''

It will be noted from the foregoing excerpt that counsel in that case representing complainant conceded that the city, in operating an electric plant, would be acting in its proprietary capacity.

▆▆ Much of the bill, and the brief on behalf of complainant, is devoted to a discussion of the policy and wisdom of the various statutes, both state and federal, questions with which the courts have nothing to do. It is further charged that these federal agencies, the state, and the city of Memphis have entered into a conspiracy to injure or destroy the business of complainant. If the involved contracts are valid, necessarily there is no basis for such a charge. In *Ashwander* v. *Tennessee Valley Authority, supra,* the court, in affirming the decree of the Circuit Court of Appeals, said:

''We agree with the Circuit Court of Appeals that the question to be determined is limited to the validity of the contract of January 4, 1934. The pronouncements, policy, and program of the Tennessee Valley Authority and its directors, their motives and desires, did not give rise to a justiciable controversy save as they had fruition in action of a definite and concrete character constituting an actual or threatened interference with the rights of the persons complaining. The judicial power does not extend to the determination of abstract questions.''

MR. JUSTICE SIBLEY, of the Circuit Court of Appeals, added the following brief concurring opinion to the opinion of that court in the *Ashwander Case,* 5 Cir., 78 F. (2d), 578, 583:

''The district judge also found that the TVA board

had very far-reaching plans for social experimentation which he thought beyond the constitutional limits of the federal power. This case is not to be decided by the purposes and plans of the board, but by the validity of what is about to be done under the attacked contracts. The contracts deal only with surplus power arising at the Wilson Dam which may, as we hold, be disposed of by Congress. The manner of the disposal of public property and the extent to which it may be allowed to affect private business are within the discretion of Congress. An exercise of legislative discretion is reviewable at the ballot box rather than in the courts."

These contracts are simply business agreements that the respective parties have a lawful right to enter into, and which appear to us to be reasonable and free from any constitutional restraint. Complainant, no doubt, feels aggrieved that these governmental agencies are preparing to compete with it in the distribution and sale of electric energy, but that does not render the contracts here involved invalid. *U. S. Shipping Board Emergency Fleet Corporation* v. *Western Union Tel. Co.,* 275 U. S., 415, 48 S. Ct., 198, 72 L. Ed., 345; *Standard Oil Co.* v. *City of Lincoln,* 114 Neb., 243, 207 N. W., 172, 208 N. W., 962, affirmed in 275 U. S., 504, 48 S. Ct., 155, 72 L. Ed., 395.

Finding no error in the decree of the chancellors, it results that it must be affirmed.