GREEN BAY & MISSISSIPPI CANAL COMPANY, Appellant, vs. KAUKAUNA WATER POWER COMPANY, Respondent.

*September 25 — December 17, 1901.*

*Waters: Ownership of power created by dam: Wrongful taking: Action, tort or contract? Pleading: Measure of damages.*

1. A complaint alleging that plaintiff is the owner of the hydraulic power created by a dam in a river, and that defendant wrongfully entered into possession of, and wrongfully took and appropriated to its own use, a part of such power of a certain value, states a cause of action *ex delicto.*

2. When a complaint states facts from which loss or injury is im-plied, the law draws the implication, and formal allegation of in-jury is not necessary.

3. Where plaintiff, as owner of the hydraulic power created by a dam in a river, had the right, subject only to the needs of navigation, to use the entire body of water stored in the pond, and defendant by drawing off water from the pond wrongfully took and appropriated a part of the power, the action to recover damages for such taking is not for a mere diversion of the water of the stream, but for the

taking of water legally impounded, capable of producing power, and therefore a thing of value to plaintiff, even though the latter had no existing facilities for its use.

4. The measure of damages in such a case is the rental value each year of the actual amount of horse power taken at the dam, with simple interest computed from the close of each year, the recovery to be limited to water taken during the six years next preceding the commencement of the action.

5. The circumstances of this case are *held* not to be such as would permit the allowance of exemplary damages.

APPEAL from a judgment of the circuit court for Outagamie county: JOHN GOODLAND, Circuit Judge. *Reversed.*

This action was commenced in August, 1896, to recover the value of the use of plaintiff's water power wrongfully appropriated by the defendant. The complaint sets out plaintiff's ownership of the water power on the Fox river furnished by the upper dam at Kaukauna; that on May 9, 1896, the defendant " wrongfully entered into possession of, and wrongfully took and appropriated " to its use, one half of said hydraulic power, stating the manner in which it was done; that an action was commenced by plaintiff against defendant to determine the title to said power and to restrain defendant from its use, and on May 9, 1888, a judgment was duly entered by the circuit court for Outagamie county that the plaintiff was the owner of said power, which judgment was duly affirmed by this court and the United States supreme court; that since May 9, 1888, and until May 9, 1895, the defendant and its tenants " wrongfully continued to draw about one half of the Fox river from said pond," and has thereby " wrongfully appropriated to its own use the one-half of the hydraulic power furnished by said dam," to the damage of plaintiff as therein set forth; that defendant had wrongfully availed itself of the use of about 1,500 horse power of water power, of the annual value of $5 per horse power.

The answer alleged the building of the dam by the United

States; the defendant's ownership of land on the south side
of the river, above and below the dam; denies, with some
qualifications, plaintiff's ownership of land on the north side
of the river; admits the former litigation and judgment;
but denies the plaintiff's ownership or possession of "any
valuable water power created by said government dam, for
the reason that it had no land, headrace, canal, or other in-
strumentalities for utilizing the power of the water as it fell
from the crest to the foot of said dam;" alleges the build-
ing by defendant of a canal at large expense to utilize the
water power, through which canal it drew water, used it
for power, and discharged it below said dam, during a part
of the time mentioned in the complaint, and that said power,
"independent of said canal, would have been of no prac-
tical value; that . . . the only right of the plaintiff
which was involved was the valueless right to have the
water flow over said dam;" and denied that defendant had
appropriated or used any valuable water power of the plaint-
iff, as alleged in the complaint. The answer then set up
the statute of limitations as against any water used prior
to August 1, 1890.

The case was tried by the court without a jury. Many
of the facts were stipulated. The stipulation covered the
circumstances of building of the dam, and its location, its
height, the right of plaintiff to the water power as deter-
mined by the judgments of this court and of the United
States supreme court, the riparian rights of defendant, the
building of the canal by defendant, certain leases of the
right to draw water from said canal by defendant to its
tenants, and the prices per horse power or rentals reserved
thereby. It also provided for use in evidence of the judg-
ments referred to in the complaint. Plaintiff's other evi-
dence showed its title and right to the dam and power cre-
ated thereby, subject to the rights of navigation, the flow
of the river, the rental value of water per horse power, and

that the apportionment between use of canal and lot and water was at the rate of one fifth to the former and four fifths to the latter. It was also shown that a canal could be built at a cost of $12,000 to $15,000 of sufficient capacity to use 70,000 cubic feet of water per minute, and that the value of land on the south side of the river upon which to build a canal of that capacity, including sites for mills, would not exceed $10,000. It was verbally stipulated that the tenants of defendant drew from the pond under their leases 60,385 cubic feet of water per minute, which, on a head of eight feet, furnished 914 horse power.

The court made the following findings:

"(1) That at Kaukauna, Wisconsin, there is a fall or rapids in the Fox river, near the head of which a dam was constructed more than twenty years ago, under authority of the state of Wisconsin, for the purpose of improving the navigation of the Fox river, extending from lot five (5) of section twenty-two (22) south of the river to fractional section twenty-four (24) in town twenty-one (21) north, of range eighteen (18) east, north of the river, and that more than twenty years since there was constructed under the authority of said state, for slack-water navigation, a canal on the north side of said river, leading from the pond held by said dam to slack water below the rapids.

"(2) That said dam obstructed the flow of the water of said Fox river, and raised the same about eight feet at the south end of said dam, and about nine feet at the north end of said dam.

"(3) That for more than twenty years last past plaintiff has been and is the owner of the water power incidentally created by said dam, with the right to withdraw from the pond made by said dam all of the surplus water not necessary for navigation, either through the canal or directly from the pond, subject to any and all rights of the United States with reference thereto.

"(4) That defendant is now, and at all times since 1883 has been, the owner of all the land bordering on the south bank of Fox river from a point above the upstream end of its canal hereinafter mentioned, to slack water below the rapids in said

river at said Kaukauna, subject to the right of the plaintiff and the United States to land and maintain the end of said dam thereon.

" (5) That in or about the year 1882 defendant, being advised by its attorneys, and in good faith believing, that it owned the undivided one-half of the water power of said river, constructed on its own land, at a cost of about one hundred and fourteen thousand dollars, an hydraulic canal on the south side of said river, extending from the pond created by said dam, around the south end thereof, to a point about 2,400 feet below said dam, and divided a part of its land between said canal and said river into certain mill lots.

" (6) That from May 9, 1888, to May 13, 1895, the defendant drew through its said canal on the south side of said Fox river and from the pond created by said dam a substantial part of the flow of said river, not exceeding two fifths of the whole flow of said river in the ordinary low-water stage, and returned the same into said river below said dam.

" (7) That in defendant's said drawing of said water from said pond through its said canal, it did not in any way trespass upon the lands or property of the plaintiff.

" (8) That said plaintiff did not suffer any actual pecuniary loss by reason of said drawing of said water by said defendant.

" And the court finds as conclusions of law:

" (1) That the said drawing of said water by said defendant did no legal injury to the said plaintiff.

" (2) That defendant is entitled to a judgment dismissing the complaint herein upon the merits with costs to be taxed.

" Let judgment be entered accordingly."

Judgment dismissing the complaint on the merits and for costs was duly entered, from which the plaintiff brings this appeal.

*Lyman E. Barnes,* attorney, and *Moses Hooper,* of counsel, for the appellant.

For the respondent there was a brief by *Fish, Cary, Upham & Black,* attorneys, and *Charles Quarles,* of counsel, and oral argument by *Mr. Quarles* and *Mr. A. L. Cary.*

The following opinion was filed November 5, 1901:

BARDEEN, J.   We cannot resist the conclusion that this case has been swamped by a multitude of contentions. On the one side we are told that this is either -a case in the nature of "trespass for mesne profits," "assumpsit for use and occupation," "assumpsit for money had and received," or "trespass on the case for diversion of water." On the other we are informed that the complaint does not state a cause of action; that it does not state a case in which the tort can be waived and a recovery permitted on implied contract; that it does not state a case for mesne profits, or one for use and occupation, but is one for diversion of water from a flowing stream; and that the facts do not make out a case in which a recovery can be permitted. These questions are most learnedly discussed in briefs covering nearly 200 pages, and the positions assumed are fortified by authorities from the Year Books down to the present time. The importance of the case and the novelty of the questions assumed to be involved are a sufficient excuse for the fertile research of counsel, and for their great industry in presenting every possible phase of the litigation. But with it all we are persuaded that the actual issue involved is comparatively simple and must be determined according to well-recognized legal principles.

First, What is the cause of action stated? Unquestionably, one in tort. The plaintiff is alleged to be the owner of the hydraulic power furnished by the fall in the Fox river at a dam in the city of Kaukauna. The defendant *wrongfully* entered into possession of, and *wrongfully* took and appropriated to its own use, one half of such power, being about 1,500 horse power, of the annual value of $5 per horse power. The complaint contains a "plain and concise statement of the facts constituting the cause of action," as prescribed by sec. 2646, Stats. 1898. By apt alle-

gation it charges that the acts of defendant were wrongful, thus recognizing the rule that a cause of action must be so stated that the court may determine its character,— whether *ex contractu* or *ex delicto. Joseph Dessert L. Co. v. Wadleigh*, 103 Wis. 318. The requirements of the statute and of the rules of practice having been complied with, we need not give the complaint baptism, or christen it, as under the old practice. It is enough when the facts are stated, and *so* stated that the character of the action can be gathered therefrom. We agree with defendant's counsel that the cause of action is in tort, and bears some resemblance to the ancient action of trespass on the case.

Passing this point, we come to the claim that the complaint fails to state a cause of action. It is said that the " complaint fails to state a complete cause of action *ex delicto*, in that it does not allege that the plaintiff has suffered any direct or consequential damage by reason of the wrongful acts of the defendant." Also, it being alleged that the water had been wrongfully taken from the flowing stream, the inference is that as fast as the water was withdrawn it was instantly replaced by the natural flow of the river, " and plaintiff therefore was not deprived of any valuable use which it could or might make of the water power which it owned." We met a contention very similar to the first in its legal results in the recent case of *Luessen v. Oshkosh E. L. & P. Co.* 109 Wis. 94. There, as here, it was argued that there was no allegation of direct pecuniary injury, and hence no cause of action was stated. Here as there, we hold that, when the facts are stated from which the law raises the inference of damages, they are necessarily implied, and no direct allegation of the conclusion is necessary. Waiving for the instant the question of whether one may have such a property right in water as entitles him to damages for its conversion, we will test the complaint by the rule stated. It alleges that the plaintiff was the owner

of a certain water power. The law implies that it was entitled to its free and unobstructed use. The defendant wrongfully entered, and wrongfully appropriated to its own use one half of said power, or about 1,500 horse power of the same, which was of the annual rental value of $5 per horse power, "to the damage of this plaintiff as herein set forth." Conceding the right of property to exist, what inference or implication does the law draw from those facts? Using an illustration used on the argument: Suppose plaintiff's horse was running in its pasture, and the defendant wrongfully entered, and took the horse, and used it for a season, the value of such use being fifty cents per day, would any one contend that the plaintiff must allege that it was deprived of the use of the horse so that it was unable to plow its corn field, or market its potatoes, in order to state a "complete cause of action *ex delicto*"? When the facts are stated from which loss or injury may be implied, the law draws that implication, and formal allegation of injury is not necessary.

Since the determination of the litigation between the parties to this action as shown by the opinion of the United States supreme court (*Green Bay & M. C. Co. v. Patten P. Co.* 172 U. S. 58), this court cannot, nor will it permit the defendant to, question the rights of the plaintiff with reference to the water power in question as there determined. That decision settled those rights to be absolute ownership, subject only to the rights of the government in aid of navigation. As we understand it, subject to those rights the plaintiff might do as it pleased with the entire body of water stored in the pond. It might allow it to run to waste, or rent it to its tenants, or divert it to its own use. We know of no limitation upon that right save that before mentioned. We cannot, if we would, surround it by new or different limitations. As it was adjudicated, so must it stand. According to the defendant's contention, that right was a mere

abstraction; a mental conception without reality or sub-
stance; "a barren right" of no property value; a mere right
to have the surplus water not needed for navigation flow
over the dam, of no value to plaintiff unless it had facilities
for using it as it passed,— a most specious contention, find-
ing some support in loose expressions and random remarks
found in some of the cases. In support of their position they
say:

"The law is well settled, both in England and in this
country, that no action to recover substantial damages can
be maintained for the diversion of water unless the party
complaining alleges and proves that some existing mill has
been injured, and the use made less valuable, by reason of
the diversion."

They refer us to the cases of *Williams v. Morland*, 2 Barn.
& C. 910, and *Mason v. Hill*, 3 Barn. & Adol. 304, and 5
Barn. & Adol. 1, as establishing the rule in England. The
first case was an action by a downstream landowner against
his neighbor on the stream above, who had built a dam and
thereby prevented the water from running in its usual course,
in its usual calm and smooth manner, and thereby the water
ran in a different channel, and with great violence, and in-
jured the banks and premises of the plaintiff. The jury found
the banks were not injured. BAYLEY, J., says:

"Flowing water is originally *publici juris*. So soon as it
is appropriated by an individual, his right is coextensive
with the beneficial use to which he appropriates it. Subject
to that right, all the rest of the water remains *publici juris*.
The party who obtains the right to the exclusive enjoyment
of the water does so in derogation of the primitive right of
the public. Now, if this be the true character of the right
to water, a party complaining of the breach of such right
ought to show that he is prevented from having water which
he has acquired a right to use for some beneficial purpose.
Here the declaration states a right to the use of this water
at all times; but still, if the plaintiff had as much water as
could be necessary for his purpose, the defendant would have
been guilty of no wrong by preventing additional water from
coming to the plaintiff's premises."

Another judge said:

"The mere obstruction of the water which had been used to flow through his lands does not give any right of action. In order to entitle him to recover, he should show the loss of some benefit, or the deterioration of the value of his premises."

*Mason v. Hill* was a similar action, except that the water diverted by the upriver owner was not returned to the original channel, but was suffered to pass away on a level below the plaintiff's works. The opinion by Denman, C. J., contains an interesting discussion of the question involved, and holds that the lower owner, having shown actual damage, was entitled to judgment.

It requires but a casual glance at the cases to disclose that the questions discussed and decided are in no way parallel with the ones here involved. The plaintiff here is not seeking to recover damages for water merely diverted from its premises, or damages for water thrown on its premises in such a manner as to injure them. It is seeking to recover the market value of water which it had legally impounded, and which was unlawfully taken by defendant. But it is said the plaintiff had no mill. It had no means of using the water. It has suffered no substantial damage. It had but a "barren right" of no property value unless it had facilities for using the water, and hence cannot maintain this action. We do not consider this an action merely for *diverting* water, within the principle of the cases cited by defendant. It is rather an action for *taking* water which had legally been gathered in a pond, and capable of producing potential energy. True, the plaintiff did not thereby secure a property interest in any particular particle of water. Water is a movable and wandering thing, and when it runs out of my pond into another man's I have no right to reclaim it. But when I have built a dam, and created a reservoir, kept full by the natural flow of the stream, I have created for myself a property right to use the stored water, just as valu-

able and just as substantial in point of law as would be the right to use my horse. It may be subject to some limitations not surrounding other species of property, but they are not material to the questions here involved. To say that because I have no mill, or no facilities to use the energy so stored up, I am not injured when some one comes along and wrongfully appropriates it to his use, would be a solecism in the law without parallel. As well might the defendant say, when sued for the use of the horse in the case supposed: "You were not using the horse. You had no work for him to do. He was running idle in the pasture. You have lost nothing; hence I should not be required to pay."

A similar suggestion was thus disposed of in the *Luessen Case*, 109 Wis. 94:

"If one deprives another person of anything of value, the loss to the latter in a legal sense is not lessened at all by the circumstance, if it exists, that he intended never to enjoy it, or to bestow it as a gratuity upon another."

One of the counsel likened the defendant's alleged trespass in taking the water to the tapping of a wire charged with electricity, and diverting therefrom a given quantity of electric current or power. Defendant's counsel answer: "There is no likeness between the two. The wire is only charged with electricity by the expenditure of force or power which costs money, and the electrical current in that sense is private property to at least the value to the owner of what it has cost to produce it. The current of water, on the other hand, is furnished by nature without cost, is *publici juris*, and is not property until appropriated and used." Counsel for plaintiff aptly reply that electricity is *publici juris* until impounded on a wire. The natural flow of a river is in some sense *publici juris*, but, when impounded, and a head raised by a dam by one having authority to dam, and having incurred the expense of building and maintain-

ing the dam, the fall of the water due to the dam is not *publici juris* any more than the impounded electric current, and herein lies the distinction. The water itself may belong to the public in a sense, but the force — the energy — produced by it when stored in bulk no more belongs to the public than the banks and dam surrounding it. The storing costs money, and within the line of defendant's argument the force so impounded becomes property in the owner.

The major contention of defendant rests upon the question of whether plaintiff's right to the water is to be considered a thing of value, and, if so, what is the proper measure of damages. That plaintiff's right is of value follows as necessary corollary from the decisions of this court and of the United States supreme court. *Green Bay & M. C. Co. v. Kaukauna W. P. Co.* 70 Wis. 635; *Kaukauna W. P. Co. v. Green Bay & M. C. Co.* 142 U. S. 254; *Green Bay & M. C. Co. v. Patten P. Co.* 172 U. S. 58. That value rests upon the right of plaintiff to the free and constant use of the water in the pond, subject only to the rights of navigation. It makes no difference, so far as we can see, whether it is called " the right to use the *surplus* water created by the dam," or by some other name. Under the reservation in its deed to the United States, as we understand it, it had the right to use all the water created by the dam not required for purposes of navigation, " with the rights of protection and preservation appurtenant thereto." As to the effect of this reservation we need only refer to the language of Mr. Justice Shiras in this litigation. 172 U. S. 80.

From any point of view, the judgment of the court below was erroneous. The *title* to the thing in question was clearly established. Under any theory of the case, plaintiff was entitled to at least nominal damages. Testimony was offered showing that defendant had rented to tenants .914 horse power at an annual rent averaging $5 per horse power. It is suggested that, if the other theory of recovery

is denied, plaintiff was entitled to recover the money so re-
ceived. That, however, would be contrary to the theory of
the complaint. No doubt plaintiff might have brought the
action for money had and received, waiving the tort; but
that is not this action. The complaint alleges a tortious
taking and conversion of impounded water of a certain
market value. This is inconsistent with a claim to have
defendant disgorge money it had received. The complaint,
being in tort, cannot be changed to one on implied contract
for the mere convenience of assessing damages.

As we have already seen, it was no answer for defendant
to say that plaintiff was not in a position to use the water
if it had not taken it. The question now is, What damages
does the law imply from the situation presented? The de-
fendant seeks to apply the rule applied in many cases for
the mere diversion of the water of a running stream. *Ken-
sit v. G. E. R. Co.* 23 Ch. Div. 566, is one of a class of cases
confidently relied on to support this view. But the facts
in that and kindred cases are so entirely different from the
case at bar that they furnish little aid in in the solution of
the question before us. As we view it, there is a vast dif-
ference, in point of legal consequences, between the case of
where an upriver owner diverts the water in a flowing
stream, and the one where a stranger without right taps
the dam and takes the water from another's mill pond.
The cases above referred to hold that the owner from whose
land water has been wrongfully diverted may recover gen-
eral damages,— that is, such as the law implies from the
violation of a legal right,— and such special damages as he
is able to show. See *Blanchard v. Baker*, 8 Me. 253; *Ul-
bricht v. Eufaula W. Co.* 86 Ala. 587; *Webb v. Portland Mfg.
Co.* 3 Sumn. 189; *Bliss v. Rice*, 17 Pick. 23. Many of the
cases are somewhat misleading on the question of damages
for the reason that the real point in controversy was the
vindication of the actor's right, and little or no attention

was given to the amount of the recovery, the latter being
treated as of secondary importance. The cases bearing
upon the point at issue are not numerous. *Bliss v. Rice*, 17
Pick. 23, was a case where the plaintiff and defendant were
tenants in common of a mill on one side of a river and of
the milldam and water power. They occupied the mill by
agreement alternately, each for several days at a time, in
proportion to his interest. The defendant owned the land
on the opposite side of the river, and cut a channel from the
pond above the dam, on his own land, and used a portion
of the water to drive machinery. In a suit to enjoin the
defendant from diverting the water from the pond, the court
held that during the time each was entitled to use the mill
he was entitled to use all the water stored in the pond, and
gave plaintiff judgment for $24 per year for the unlawful
use of the water by defendant, and required him to close
his channel during the time plaintiff was entitled to use the
mill. The court directly recognized the right of property
in water and the liability for damages when that right had
been invaded.

*De Camp v. Bullard*, 159 N. Y. 450, was a case where the
court was called upon to determine the measure of damages
for the use of a stream by trespassers for floating logs. In
the discussion the court uses the following language:

" The defendant insists that the measure of damages is
not what the privilege of trespassing was worth to the tres-
passers, but what the plaintiff actually lost through inter-
ference with his business, loss of rent, and the like. As
there was no proof of actual loss of this character, they
further insist that the plaintiff is entitled to nominal dam-
ages only   This position would put a premium on trespass-
ing, because it makes the position of the trespasser more
favorable than that of the one lawfully contracting. If a
man's house is vacant, with no prospect of a tenant, and no
intention on his part of occupying it himself, and a tres-
passer occupies it, he must pay, as damages for the trespass,
the value of the use and occupation; for this would be the

duty of the tenant contracting upon a *quantum meruit* for the use, by consent, of that which the trespasser uses without consent. In cases of involuntary trespass the damages are restricted as much as possible; but, when the trespass is deliberate, intentional, and continuous, they include at least the value of the use of the premises for the period that the owner is kept out of possession."

A verdict for $500 for the use of the steam was sustained.

*Powers v. Hibbard,* 114 Mich. 533, is said to be a suit "to restrain the wrongful diversion of water for power, and an accounting." The defendants were entitled to use 105 horse power, but at times used from 150 to 175 horse power. A recovery for $7,000 damages was sustained, but the case is barren of any discussion of the basis upon which damages were allowed. Neither does it appear that the plaintiff had mills, or lost rents or sales. As near as we can determine, the recovery was allowed on the basis of value of the use in excess of the grant. These cases indicate that the value of the use of water is sometimes regarded as the proper measure of damages where it has been wrongfully taken and used. No rule of law of which we are aware, and no case that has been found, goes to the extent of declaring that impounded water is of no value unless the owner has a mill built and ready for use. Water, when so stored, is capable of producing power. It represents the expenditure of labor and money. The question of value is not affected by the actual cost of the improvements. It depends, in the first instance, upon the number of feet of head, and the means and facilities which may be at hand for its use; not what the owner then actually possesses, but what he may be able to secure under ordinary circumstances. A dam without any adjacent land or conveniences for the use of stored water might not be very valuable. But suppose the owner of the dam and the adjacent land proprietor unite, and the water is then used. Could the landowner refuse to pay for the water, or deny recompense for its use, on the ground that it was of no

value without the use of his land? Is a trespasser in a
better position than as if he had contracted? Can he be
heard to urge that, "Except for my canal, your power was
valueless. You have but a 'barren right,' and, although I
have appropriated that right and it has become valuable to
me, yet you have no remedy, because you have lost nothing.
The water was *publici juris,* and would have gone to waste
if I had not turned it to use; hence, as you have lost nothing,
you cannot expect me to pay you anything"? This is vir-
tually the position of defendant. While it may be true
that the stored water, by itself, or by reason of the surround-
ing circumstances, may be of little value, it becomes valuable
when its energy becomes applied to turn wheels and to move
machinery. When the right to use becomes merged in an
actual use through canals and wheels, it reaches the summit ·
of value. The head of water on the one side, and the canals,
machinery, and land on the other, make complete that which,
considered separately, may be comparatively insignificant.
The union or joinder of the two elements being wrongful
cannot be allowed to affect the question, otherwise the de-
fendant would be in a better position than it would have
been had it lawfully contracted with plaintiff. The facts
surrounding this litigation indicate that this will result in a
great hardship to defendant, but that fact cannot be per-
mitted to prevail over well-recognized legal principles. The
defendant's persistent use of water after it had been deter-
mined that such use was unlawful puts it in a position where
it must respond to the rigorous exactions of the law, with-
out extenuation or diminution on the ground of good faith.
As we view the situation, the law implies a liability on its
part to pay the actual value of the thing taken, when con-
sidered in connection with the manner of use, and that the
defendant cannot be heard to say that plaintiff might not
have used it or had no present facilities for its use. The posi-
tive character of the right involved and the quality of

plaintiff's ownership being established, we see no escape from the conclusion that defendant is liable for the market value of the horse power actually taken, with annual interest. Defendant's acts suspended and impaired the enjoyment of the rights possessed by plaintiff. Those rights had a definite market value, which cannot be depreciated or affected by the assertion that plaintiff was not in a position to utilize them. To permit this to be done would, as remarked by the New York court, "place a premium on trespassing, because it makes the position of the trespasser more favorable than that of one lawfully contracting." We therefore hold that the proper measure of damages is the rental value each year of the actual amount of horse power taken at the dam, with simple interest computed from the close of each year.

Ordinarily, the case, having been tried by the court, would be sent back with directions to enter judgment; but the case was not tried on the theory suggested, and we are not prepared, from the evidence presented, to determine the exact number of horse power actually taken, or the price that should be paid for the same. The defendant offered no evidence as to value, and the lower court made no finding on the subject. Neither are we prepared to say just what proportion of the rental value should be ascribed to the use of the canal and land in utilizing the water taken, although there is some evidence on the subject. In view of the situation, we deem it advisable to send the case back, with directions to the court below to take such additional testimony as either party may desire to offer as to the amount of water taken and its net value per horse power as suggested, and to enter judgment for the plaintiff for that amount. Of course, the recovery must be limited to the water taken during the six years next preceding the commencement of the action.

We do not think the circumstances of the case are such as

would permit the allowance of exemplary damages, or any damages beyond the net market value of the water taken with interest.

*By the Court.*— The judgment is reversed, and the cause is remanded for further proceedings as indicated in the opinion.

A motion by the appellant for a rehearing was denied December 17, 1901.