LANCASTER & JEFFERSON ELECTRIC LIGHT CO. *v.* JONES *& a.*

The principle that the construction of a deed is the ascertainment of the expressed intention of the parties, determined by the weight of competent evidence and not by the application of arbitrary rules, does not authorize the use of evidentiary matter not proper for consideration in the interpretation of written instruments.

Oral evidence as to the actual purpose of the parties is not competent on the question of the construction of a deed, although admissible in a proceeding for its reformation.

Under a deed conveying the right to build a dam not exceeding ten feet high across a stream, the grantee is entitled to maintain a dam ten feet in height above the mean elevation of the river bed at the point specified.

Evidence that a riparian proprietor secured additional water-power by encroaching upon the flowage rights of a competitor located on the same stream, and thereafter obtained a portion of the business previously done by the latter, does not conclusively prove that such loss of patronage was proximately caused by the wrong complained of.

A mill-owner who wrongfully flows back the water of a stream, and thereby obtains the use of power to which a proprietor above him is entitled, is liable to the latter for the fair rental value of the power so taken; and upon the question of value, the benefit accruing to the wrongdoer from such use is competent evidence.

BILL IN EQUITY, alleging the wrongful maintenance of a dam upon Israel's river to the injury of the plaintiffs, owners upon the

stream above, and asking a reformation of deeds and an assessment of damages, with a prayer for an injunction. Trial by the court and decree for the plaintiffs. Transferred from the April term, 1907, of the superior court by *Pike*, J.

*Edgar M. Bowker* and *George F. Morris*, for the plaintiffs.

*Drew, Jordan & Shurtleff* and *Smith & Smith*, for the defendants.

PARSONS, C. J. The questions transferred are (1) the construction of the deeds in the defendants' chain of title as to the extent of their rights in the river,—whether as riparian proprietors they own one half, or the whole, of the power furnished by the stream at their dam, and as to the height to which they own the right to maintain the dam,—and (2) the measure of damages.

December 6, 1890, Harry E. Stevens conveyed by deed of that date to Cauger & Sullivan a tract of land on the northerly bank of Israel's river. After describing this tract by courses, distances, and monuments, the language of the deed is: " This deed giving said grantees the right to raise a dam across said river not exceeding ten feet in height at a point seventeen rods and ten links westerly of the first named bound, or at any point easterly on said land, but the flowage shall not be further up said river than would be occasioned by a dam at the aforesaid point and at the above height. Also we hereby convey to said grantees all our right, title, and interest which we may have in any way acquired in and unto said river or in and unto any water-privilege on the south shore, or opposite bank or shore, of said river as far on said river as the tract above conveyed shall extend." The deed by an imperfect description, as to the proper correction of which there appears to be no controversy, also conveys a small lot of land on the south shore at the end of the dam then on the premises. At the date of this deed Stevens owned on the south shore of the river a tract of land substantially opposite the main tract conveyed, title to which through sundry conveyances, starting with a later quitclaim from Stevens, is now held by the defendants. The plaintiffs, however, claim to own the riparian rights appurtenant to the land, by virtue of a reservation in one of the intermediate deeds and a subsequent lease to them.

The character or extent of the plaintiffs' alleged rights in the river, disassociated from the adjacent land which the defendants own, have not been presented or considered. The controversy has centered upon the deed of Stevens to Cauger & Sullivan, for the obvious reason that if the rights in controversy passed by that deed nothing remained in Stevens upon which his later quitclaim could

operate.   The plaintiffs do not in any view of their title own any-
thing which was conveyed by the earlier warranty deed.   If the
plaintiffs' claim to the riparian rights is unfounded, it is equally
immaterial who does own them.   Hence the correct construction of
the deed to Cauger & Sullivan is the decisive point in the contro-
versy, if the interpretation finally adopted by the superior court is
correct.   The intention to be ascertained is that expressed by the
parties by the language they used.   What did they mean by the words
employed ?   Or, to follow Wigmore's suggestion, what is the "sense"
of the language?   4 Wig. Ev., s. 2459 ; *Kendall* v. *Green,* 67 N. H.
557, 558 ; *Stratton* v. *Stratton,* 68 N. H. 582, 585.   In the lan-
guage of Judge *Ladd,* " the question   .   .   .   is not what the
parties intended to do, but what did they do ?   What intention did
they express in the deed ?"   *Pillsbury* v. *Elliott,* 56 N. H. 422, 425 ;
*Gill* v. *Ferrin,* 71 N. H. 421.

The often announced and applied principle, that the construc-
tion of a written document is the ascertainment of the intention of
the parties, determined like a question of fact by the natural
weight of competent evidence and not by the application of arbi-
trary rules, does not authorize the use as evidence of matter not
proper for consideration in the interpretation of a writing.   It does
not abolish the well established rule that a written instrument
cannot be contradicted or varied by parol extraneous evidence.
*Meredith etc. Ass'n* v. *Drill Co.,* 66 N. H. 267 ; *Goodwin* v. *Good-
win,* 59 N. H. 548 ; *Proctor* v. *Gilson,* 49 N. H. 62.   The oral
evidence of the intention of the parties, received by the court sub-
ject to exception upon the issue of reformation, is as inadmissible
upon the question of construction as the finding of the fact of
intent.   The force of the rule lies more in the refusal to be bound
by the application of arbitrary rules, than in the denomination of
the matters proper for consideration as competent evidence, or in
describing the making of the correct deduction therefrom as the
weighing of evidence,—language which has sometimes been mis-
understood.   *State* v. *Railroad,* 70 N. H. 421, 433, 434.   In ascer-
taining what the language meant to the parties employing it, the
sense, signification to them of the terms employed, all evidence
tending to put the interpreter of the words in the position of the
one employing them, are an aid to the interpretation.   Hence it is
elementary that in construing written language " it is the duty of
the court to place itself as nearly as possible in the situation of
the parties at the time the instrument was made, that it may gather
their intention from the language used, viewed in the light of the
surrounding circumstances.   It will inquire into the ' actual, right-
ful state of the property,'   .   .   .   for the parties are supposed
to refer to the state of the property for a definition of the terms

made use of in the writing." *Weed* v. *Woods*, 71 N. H. 581, 583; *Swain* v. *Saltmarsh*, 54 N. H. 9, 16; *Bell* v. *Woodward*, 46 N. H. 315, 331. "If the language is plain and unambiguous, it cannot be contradicted by extraneous evidence, for that would be giving effect to a contract not reduced to writing. . . . That the parties meant something must be assumed. If they are English-speaking people, and use the English language to express the terms and conditions of their contract, it is safe to say, in the absence of competent evidence to the contrary, that the language of the contract must be understood to convey the ordinary and usual meaning of the English language, as used in the community where the parties live." *Kendall* v. *Green*, 67 N. H. 557, 562.

It is conceded that, giving to the language of the deed the sense in which it is ordinarily employed by English-speaking people and applying it to the situation existing at the date of the deed, the document expresses an intention to convey all the grantor's rights in the river; and as he owned the entire right, such right was conveyed thereby. The evidence claimed to be competent and sufficient to establish that the deed expresses a purpose to convey only the power appurtenant to the north bank, or one half of the stream, is as follows: Prior to the development of the power at the defendants' dam, the land on the north bank was owned by Royal Joyslin; that on the south bank by Frederick Fiske. In April, 1864, Joyslin and Fiske each conveyed by separate deeds to the same persons as grantees a portion of their lands bordering on the river, describing the tracts by courses and distances. Joyslin's deed contained the following clause: "Also we hereby convey to said grantees all our right, title, and interest which we may, in any way, have acquired in and unto said river, or in and unto any land or water-privilege on the south or opposite bank or shore of said river as far on said river as the tract above conveyed shall extend." Fiske's deed contained the clause in the same words, substituting "north" for "south." The title so united in the common grantees of Joyslin and Fiske came by sundry intermediate conveyances to Harry E. Stevens. In making these conveyances, the draftsmen of the deeds, instead of setting out a new description covering the united properties, contented themselves with repeating entire the descriptive portions of each deed from Joyslin and Fiske.

It is urged that since neither Joyslin nor Fiske owned anything upon the opposite bank of the stream, this clause (which has been called the "quitclaim" in the discussion) conveyed nothing and meant nothing, and that as in the subsequent deeds all rights in the river passed by the description of the land on each side, the repetitions of the "quitclaim" clauses were equally useless and

ineffective; and hence it must be concluded, it is urged, that the same clause in the Stevens deed to Cauger & Sullivan conveyed nothing and meant nothing. There is no reference to the prior deeds in the deed to Cauger & Sullivan, and of the competency of the evidence there may be grave doubt; but regardless of its competency, there can be no doubt that, as the only evidence offered, it is entirely insufficient to authorize the construction of a clause expressly conveying a right as one reserving or excepting the right. It may be true that if Fiske and Joyslin owned neither land nor water-privileges on the opposite bank, the clause added nothing to their deeds; but the clause plainly expressed a purpose to convey all the rights either owned on the opposite shore. Demonstration that neither owned anything which could pass under the clause would establish that the clause was unnecessary, but would not alter the purpose expressed by the language used, while if the two tracts were exactly coterminous on the river the repetition of the clause in the subsequent deeds was equally unnecessary; the meaning of the language used would not be altered by that fact. Although the lots may be practically coterminous upon the river, the plan attached to the case indicates that they are not exactly so; and the repetition of the language made sure that all that was conveyed by Joyslin and Fiske was transferred. The form of the deeds may be inartistic, but the expressed purpose is clear.

But the argument entirely fails because it is not founded in fact. The "quitclaim" clause in the deed from Stevens to Cauger & Sullivan is not identical with the clause as used in the earlier deeds. The clause in the earlier deeds conveys the grantors' rights to the river and to any *land* or water-privilege on the opposite bank. Stevens omitted the word "land," limiting the conveyance to water-privileges. Recognizing his ownership of the land, in using the earlier description he varies it by omitting what he did not intend to convey, and in the next clause of the deed defines the amount of land he intended to convey on the south shore by the description of the small tract at the end of the dam. If it could be established from prior usage in the community that, to the parties to this contract, the sense of the expression conveying all of Stevens' right was a reservation of one half of what he owned,—that a conveyance of the land and rights on the opposite shore was to them in effect a reservation of all rights not legally appurtenant to the tract conveyed,—it is not necessary to consider whether the effect claimed could be given to the deed. There is nothing in the evidence tending to such a conclusion. So far as the language is identical, the purpose expressed in the last deed is exactly what was expressed in the deeds of Fiske and Joyslin—the conveyance

of all the rights the grantors had in the river. That one deed was without effect for lack of property upon which it could act cannot prevent the subsequent deed from conveying property within its terms. What the parties understood or believed would be the effect of the provision is immaterial. " The belief of the parties as to the effect of the deed could neither add to nor diminish its force. Deeds will take effect according to their legal import, if at all, and not according to the erroneous opinion of the parties as to what that effect may be." *Furbush* v. *Goodwin*, 25 N. H. 425, 456; *Reed* v. *Hatch*, 55 N. H. 327, 335.

The plaintiffs' real position seems to be that Stevens' purpose—— " his will " (4 Wig. Ev., s. 2459)——was to convey the Joyslin tract only; that by mistake in following the description in the earlier deed, without attention to the changed condition, an intention was expressed to convey rights which Joyslin could not convey because he did not own them. The contention is that it was not intended to express a purpose to convey the whole river, rather than that such purpose was not expressed. If the deed were erroneous, on proof of the fact, upon a case made for the purpose, the deed could be reformed; but upon the trial of this issue of fact, the contention has been found to be unfounded. Whether the defendants are in a position to ask for a reformation of the deed, if the expressed intention were different from that intended to be expressed, does not appear. Hence it has been necessary to determine the controversy as to the intention actually expressed. A further consideration is to be found in the deed, tending to show that the intention expressed could not have been understood to have been limited to the right Joyslin conveyed. The deed contains a right of flowage. Joyslin could convey that right only as to his land. It is not probable Stevens conveyed and Cauger & Sullivan bought a right of flowage limited to one side of the stream, impossible of exercise unless the same right existed as to the opposite side of the stream. The absurdity of such a contract would be evidence the parties did not intend to make it. The right of flowage is given in general terms. If understood to be limited to that acquired by Joyslin's deed, express language so defining it would be necessary. It is not claimed that the flowage right is so limited; but Joyslin's deed is no more effective in conveying a right of flowage on the south shore than his deed of land and water-privileges on the south shore. There was no error in the ruling of the superior court, that the plaintiffs had no rights in the river as far as the defendants' land extended on the north shore, though the fact of actual purpose in the conveyance of Stevens to Cauger & Sullivan, found *de bene*, cannot be considered.

The remaining question of construction is as to the height of

the dam. It is understood that the plaintiffs own the land upon the stream above the defendants, formerly owned by Joyslin and by Fiske, and the question is to what extent the defendants have the right to flow the same under the deeds of Joyslin and Fiske in 1864. The language defining this right is " the right to raise a dam across said river not exceeding ten feet in height" at a point named or at any point easterly, *i. e.*, up the stream, " but the flowage shall not be further up said river than would be occasioned by a dam at the aforesaid point and at the above height." This language makes it clear that the parties were dealing with the question of flowage—not of power obtainable by the dam. The power obtainable was not made the measure of the right. Consideration of the amount obtainable has no tendency to elucidate the meaning of the contract. *Perley* v. *Marshall*, 57 N. H. 206. By virtue of the conveyance of the land to them, the grantees of Joyslin and Fiske had the right, so far as the owners above were concerned, to build a dam as high as they pleased on their own land, so long as the dam did not set the water back upon the owners above; so that the only purpose of the clause as to the dam was to convey a right of flowage above the land conveyed in fee. The measure of this right is the flowage that would be occasioned by a dam at a certain spot ten feet high.

Dams are not built upon the surface of the water, but upon the river bottom. It could not have been expected that the grantees would lay the sills of the dam on the surface of the water. It is equally absurd to commence to measure the height of the dam from that surface. It is common knowledge that the foundations of a dam must in ordinary cases be built below the surface of the river bed; but as nothing below the bed of the river would be a dam, or cause the water to flow back, the dam, as a construction tending to set the water back, commences at the river bed. In this case it appears that at the point selected the river bed, as is not unusual, is at different elevations. It is common knowledge that the crest of the dam over which the water flows—the spillway—is usually horizontal. In view of common experience, it is not probable that it was understood or expected a dam would be built with every point of the crest ten feet above the elevation of the original river bottom vertically beneath it. While such a dam might exactly conform to the language of the grant, the cost of so building it and the uselessness of such construction, as well as common practice, are sufficient evidence that that particular construction was not expected or required. A dam constructed so as to produce no more flowage than such a dam would not exceed the right of flowage conveyed. The mean elevation of the river bed in 1864 is found (65.25). It is also found that the normal

flow of water was one foot in depth. A dam ten feet in height above the mean river bed, or to an elevation of 75.25, and so constructed as to maintain above it a depth of one foot of water, will raise the water ten feet, give ten feet head, and flow the water back precisely as if the river bed were raised in conformity to its natural contour ten feet at the place specified for the dam. It is suggested that the water will not attain such a depth on the horizontal crest of a dam as it would in the stream, but this must depend upon the length of the spill-way. To allow the escape of water in time of flood, it may be necessary to so construct the spill-way that the normal flow will not give a depth of one foot on the dam. The dam-building right is to construct a dam ten feet high with the water one foot in depth upon it—to raise the water of the stream at the point defined in mean or normal flow ten feet, or to 76.25. A dam reasonably constructed so as to do this will not exceed the flowage right granted. Whether the crest of the present dam (76.09) raises the water above this point does not appear. If it does, to the extent that it has that effect during the mean or normal flow of the stream such excess is an invasion of the plaintiffs' rights. The superior court ruled that the defendants had the right to maintain the dam to the elevation 76.25. This is, however, the measure of the height to which they may rightfully raise the surface of the water. If, as there is some intimation in the case, the fact is that the flow of the stream is all utilized through the defendants' wheels, the maintenance of flashboards to the height permitted in the decree will furnish no legal ground of complaint to the plaintiffs. If the plaintiffs request it, however, the decree should be amended so as to prohibit the raising of the water at its normal or mean flow by flash-boards or other means above the elevation 76.25, or sixteen one-hundredths of a foot higher than the crest of the present dam.

The plaintiffs and defendants are each engaged in furnishing electricity for lighting and are competitors in the same territory. The defendants, by raising the water at their dam above the height to which they could lawfully hold it, obtained additional power which enabled them to do more business, and they obtained a portion of the business previously done by the plaintiffs. The plaintiffs claim as damages the value of this business lost by them and secured by the defendants. It is not clear from the case whether the raising of the water impairs the plaintiffs' power at the privilege farther up the stream, but it is found that the plaintiffs lost no business by the impairment of their power, and that the loss of business sustained by them was not " the natural and probable consequence " of the unlawful raising of the dam. The court therefore disallowed the claim for damages for loss of business.

The plaintiffs are entitled to recover of the defendants in some form of action damages for all injury directly and naturally resulting from the defendants' wrongful act, *i. e.*, of which that act was the proximate cause. They cannot recover for subsequent occurrences of which the act furnished merely the occasion, upon which other causes operated to produce the injurious result. *Prescott* v. *Robinson*, 74 N. H. 460; *Challis* v. *Lake*, 71 N. H. 90, 96; *Dow* v. *Gas Co.*, 69 N. H. 312, 315, 316; *Bixby* v. *Dunlap*, 56 N. H. 456, 462; 6 Thomp. Com. Neg., ss. 7193, 7196; 1 Sedg. Dam. (8th ed.), s. 111; 1 Suth. Dam. (3d ed.), s. 16. The necessary connection between the wrong and the injury is stated as "the natural order of cause and effect," "its natural concomitant," "legal and natural," "direct and natural," "natural and continuous," "natural and probable," "natural and reasonable," "the natural consequence . . . and such as might have been anticipated by the exercise of reasonable prudence," or such as "naturally and reasonably could be expected to result." All these statements, however, are made as definitions of proximate cause, or perhaps more accurately as statements of the conditions under which the wrong could be found to be the proximate cause of the injury. *Gilman* v. *Noyes*, 57 N. H. 627; *Searle* v. *Parke*, 68 N. H. 311; *Pittsfield etc. Co.* v. *Shoe Co.*, 72 N. H. 546, 548; Cool Torts 68–77; Shearm. & Red. Neg., ss. 26, 739; and authorities above cited. Whether the defendants' wrongful act was the proximate cause of the injury complained of is a question of fact. *Ela* v. *Cable Co.*, 71 N. H. 1; *Hendry* v. *North Hampton*, 71 N. H. 26; *Olney* v. *Railroad*, 71 N. H. 427; *Hamel* v. *Company*, 73 N. H. 386.

Whether from the evidence reported and other evidence, if any, in the case it could have been found that the wrongful act of the defendants was the proximate cause of the plaintiffs' loss of business, is not the question presented. The plaintiffs had the burden of satisfying the trier of the fact that it was more probable than otherwise that the injury of which they complained was caused by the defendants' act. They have failed to sustain this burden. The evidence reported does not establish their claim as matter of law. The raising of the dam furnished the defendants with more power—put them in a position to do business which the plaintiffs were also equipped to perform. Why one lost and the other gained,—why the defendants obtained business which the plaintiffs lost, instead of the plaintiffs getting business from the defendants,—are questions which obviously are not answered by the mere fact that each had the necessary facilities. Whatever the cause of the plaintiffs' loss of business, such loss is not the necessary result of some other in the community offering the same article for sale.

Having denied the claim to special damages from loss of business, the superior court found that "the damage to the plaintiffs' realty by the raising of the . . . dam to an unlawful height . . . is one dollar," and entered a decree for one dollar damages. While each riparian owner has a right to a reasonable use of the stream as it flows over his land, still if he obstructs the stream so as to cause the water to flow back and flood the land of the owner above him, he is liable to such owner for the actual injury so occasioned. If the water be raised perceptibly upon the land above, such owner may maintain an action for nominal damages, though no actual damages are proved. *Gerrish* v. *Company*, 30 N. H. 478; *Amoskeag Mfg. Co.* v. *Goodale*, 46 N. H. 53. The finding and decree amount to a ruling that upon the facts only nominal damages could be recovered. Exception was taken to the ruling, and the plaintiffs claim that they are entitled to substantial damages.

The power of the river, from the bottom of the defendants' raceway to the top of the plaintiffs' dam, is owned by the two parties. The defendants by their wrongful flowing obtained and used with profit more of this power than belonged to them. The extra power so used must necessarily have been the property of the plaintiffs. If the defendants have wrongfully used to their profit the plaintiffs' property, does the law limit their liability to make compensation to nominal damages? Reliance has been placed upon the case of *Roberts* v. *Company*, 74 N. H. 217. In that case it was held that adjacent riparian proprietors on the opposite banks of a stream were tenants in common of the right to use the stream passing over their lands, each owning an undivided half; and that if one tenant used more than his share of the right, he could be required to account equitably to his cotenant for the benefit received from the use of his cotenant's right. *Gage* v. *Gage*, 66 N. H. 282. While "all proprietors upon a stream, from its source to its mouth, have, in a certain sense, a common interest in it and a common right to the enjoyment of all its capacities" (*Lowell* v. *Boston*, 111 Mass. 454, 465), the difficulty with the application of the principles of tenancy in common in the adjudication of the rights now involved is that the rights in controversy are not held in common. The defendants' right begins at elevation 76.25. There the plaintiffs' right ends. Their rights are not common, but separate in fact and by deed. It is found that the defendants did not act with malice, which is understood to mean that they acted in the exercise of their right as they understood it; but the wrongful flowing was deliberate, intentional, and continuous. The damages in a trespass of that character "include, at least, the value of the use of the premises for the

period the owner is kept out of possession." *De Camp* v. *Bullard*, 159 N. Y. 450, 454. Upon the question of the value of the use, the benefit to the defendant is evidence. *Ib.* 455; 4 Suth. Dam., *s.* 1014. If the proper action for flowing land is case instead of trespass, there may be the same exclusion of the owner from the use of his land and the same ground for damages.

Whether the flowing diminished the power at the plaintiffs' dam is perhaps not quite clear from the case. As to this the parties do not interpret the findings alike; but as it is found that the plaintiffs' power was not so impaired as to prevent their doing all the business they had to do, the ruling seems to have been put upon the ground that if the plaintiffs' power was taken away they could recover nothing, if they had no occasion to use it while the defendants were using it. In an action for flowage, the measure of damages is the actual injury to the land by the overflow, or its fair rental value during the time of the flowing. Gould Wat., *s.* 214; *Baldwin* v. *Calkins*, 10 Wend. 167; *Chicago* v. *Huenerbein*, 85 Ill. 594;—28 Am. Rep. 626. In an early case in Massachusetts for overflowing a mill privilege which had been improved, but which was not in use or capable of use during the time of the flowing, the plaintiff was permitted to recover as damages interest upon the value of the privilege if unobstructed. *Hatch* v. *Dwight*, 17 Mass. 289. In Massachusetts, the demandant in a writ of entry recovering against a disseisor is by statute permitted to recover in that action the "full, clear, annual value of the land," instead of being put to a separate action. *Proprietors* v. *Railroad*, 104 Mass. 1, 12. In trespass for mesne profits the plaintiff is entitled to recover from the tenant such profits as have been received from the premises. *Withington* v. *Corey*, 2 N. H. 115. In some form of action, one who has been wrongfully excluded from his realty is entitled to compensation for the use of his property had by the wrongdoer. He is not confined to nominal damages by the return of his property without diminution in its value.

The measure of damages for the permanent flowing of land is the difference between the value of the land free from and subject to the right. *Wright* v. *Company, ante,* 3. It has never been suggested that the fact that the landowner had not put and had no intention of putting the land to any beneficial use was an answer to the claim for damages; but such contention would be as reasonable as the claim that the owner cannot recover for the use of his land by a wrongdoer because during the existence of the wrong he had no occasion to put it to a beneficial use. To use the illustration in *Green Bay etc. Co.* v. *Company*, 112 Wis. 323,—62

L. R. A. 579, as well might one sued for wrongfully appropriating the use of the plaintiff's horse defend against the damages upon the ground that the plaintiff had no use for the horse. "If one deprives another person of anything of value, the loss to the latter in a legal sense is not lessened at all by the circumstance, if it exist, that he intended never to enjoy it, or to bestow it as a gratuity upon another." *Ib.* 333. The owner may prefer the property shall not be put to use. Such is his right if he considers the non-use more valuable to him. That no use shall be made at all may be of more value to the owner than any benefit that could be obtained from use.

As no damage has been done to the realty, it is to be presumed that whatever property of the defendants was flowed is now of the same value it was before; and as the claim for damages to business has failed, the only ground upon which the plaintiffs can recover is the rental value of their property, if it has any under all the circumstances. If it has, it is immaterial whether the plaintiffs would or would not have received any income from it if it had not been overflowed. If the flowing took away part of the power developed by the dam above, the rental value of the power so taken would be more than nominal. That the owner was not using the power created by his investment in land and improvement would be no reason why one wrongfully using it should not pay the fair value of the use. *Hatch* v. *Dwight*, 17 Mass. 289. Such flowing would transfer power developed by the plaintiffs' dam to the defendants, and would be as much an infringement of the plaintiffs' property right as if the defendants had directly connected their wheels with the plaintiffs' pond. For such diversion of power, one effecting it by wrong is liable for the fair rental value of the power so taken. *Green Bay etc. Co.* v. *Company*, 112 Wis. 323,—62 L. R. A. 579. There is no difference in principle whether the power is taken by drawing water from above the dam or by backing it up at the foot. What the defendants obtain in either case is the use of the plaintiffs' property ; and the value of the use measures what the defendants ought to pay and the plaintiffs receive. If the flowing was a mere increase of the depth of water in an unimproved part of the stream not capable of use in connection with the plaintiffs' dam, and capable of enjoyment only through the defendants' dam, the power so produced would not be the fair measure of value. But this is not a case of first appropriation by the owner below, because the limit of his right has been defined by deed for more than forty years. The right to raise the water is of value. When that is found, the rental or income value during the time the defendants wrongfully enjoyed it can easily be found. There should be a further hearing on the

question of damages, which should be assessed at the fair value of the use of the plaintiffs' right wrongfully enjoyed by the defendants. Upon this question the income received by the defendants from its use is evidence, but the amount received is not its measure.

*Case discharged.*

All concurred.